MARYLAND LUMBER COMPANY *v.* WHITE ET AL.

[No. 142, October Term, 1953.]

182

186

*Decided July 2, 1954.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.

*William Saxon* for the appellant.

*Lawrence I. Weisman,* with whom were *Nyburg, Goldman & Walter* on the brief, for the appellees.

BRUNE, C. J., delivered the opinion of the Court.

This case involves an original suit and a cross-claim, and there are appeals from the judgment below on each of them. The original suit was essentially one for conversion of a carload of lumber and plywood; the cross-claim is based upon alleged breaches of contracts for the sale of plywood and of a carload of doors and upon a claim for moneys due upon accounts stated.

The parties are Dan Schloss and Jerry Schloss, co-partners, trading as the Baltimore Lumber Company (hereinafter usually referred to as "Baltimore"), H. A. White, trading as the H. A. White Lumber Company (hereinafter usually referred to as "White"), Maryland Lumber Company, a corporation (hereinafter usually referred to as "Maryland"), and (originally) The Pennsylvania Railroad (hereinafter usually referred to as the "Railroad"). White is a wholesale lumber dealer with his principal place of business in Seattle, Washington. He ships lumber and plywood on a nationwide basis. Maryland and Baltimore are lumber dealers in the City of Baltimore and are competitors whose rivalry

seems to be beyond the ordinary. They are or have been customers of White. The Railroad was the delivering carrier of a carload of lumber and plywood shipped by White in or about October, 1950.

In the original suit Baltimore and White, as plaintiffs, (Baltimore bringing suit to its own use and as assignee of White, and White bringing suit to the use of Baltimore), sued the Railroad and Maryland on a declaration which (as amended) contained four counts in tort. The chief grounds of suit were conversion by Maryland to its own use of the carload in question and conversion by the Railroad through its having misdelivered the material to Maryland, though it was consigned to White. The plaintiffs delivered an order of satisfaction to the Railroad, which was filed in the trial court on the day when the case was first reached for trial, and the Railroad is not a party to the appeals herein. On the original suit the trial court entered judgment for the plaintiffs (who will be designated as appellees here, though they are also appellants on the cross-claim) in the amount of $8,880.79, from which Maryland appeals. (Maryland will be designated as appellant here, though it is, in part, an appellee on the cross-claim.)

The cross-claim was brought by Maryland against White. Claims aggregating $7,714.47 for alleged breaches of contract were disallowed by the trial court, and Maryland appeals from such disallowance. Judgment was, however, entered in favor of Maryland against White for $1,446.01. White does not here contest judgment for $415.69 of that amount made up of various small items, but appeals from the judgment on one item —growing out of the sale of certain doors—included therein, which amounts to $1,030.32.

Maryland claims that there is a net balance due it of nearly $5,000.

On the day when the case was first reached for trial and the order of satisfaction in favor of the Railroad was filed, the appellant sought and obtained a postponement. When it again came up some weeks later, the

trial court, after hearing preliminary statements, passed an order, with the apparent consent of all parties, reciting that it appeared necessary to examine and determine the accounts between the parties and referring the case to Samuel J. Fisher, Esquire, as auditor and master "to report the pleadings and the facts and his opinion thereon" with "full power to hear all testimony in the within case * * *."

The auditor and master conducted extensive hearings and filed a thorough and carefully considered report analyzing the evidence and stating his findings thereon and his recommendations. The trial court, after a hearing upon the exceptions to the report filed by the parties, overruled each and every exception, confirmed the report in all respects, approved and adopted the auditor and master's findings of fact and conclusions of law, and in accordance with his recommendations entered the judgments above stated. Its order also awarded costs (including those of the proceedings before the auditor and master) against Maryland.

The reference of the case to the auditor and master is said by the appellees to have been made pursuant to Code (1951), Article 26, Section 9, and in the exercise of the inherent power of the trial court. The appellant makes a somewhat oblique attack in its brief in this Court on its validity on the ground that the above statute applies only to matters of account, and that the auditor and master went far beyond such matters in considering and reporting upon the question of conversion. So far as we can discover, no such objection was made in the trial court. Both sides produced considerable testimony before the auditor and master on the question of conversion and engaged in extensive cross-examination on the same question. The matters of accounting which seem to have served as the immediate occasion for the order of reference were brought into the case by the appellant's cross-claim. Even if the appellant's present objection might have been meritorious in the trial court (which we do not decide and

do not intend to imply), it comes entirely too late when first raised in this Court. See Rule 9 of the Rules of this Court Respecting Appeals.

### Motion to Dismiss the Appeal.

The appellees have moved to dismiss Maryland's appeal on two grounds: (1) that Maryland's exceptions to the report of the auditor and master are insufficient; (2) that Maryland has not complied with Rule 39, Section 1 (e) of the Rules of this Court Respecting Appeals, in that the appellant has not incorporated all of the pertinent testimony in the appendix to its brief.

(1) Sufficiency of the Exceptions. Although the appellant's exceptions to the report of the auditor and master were apparently filed late, this delay, as the appellees concede, is not fatal. *Schwartzman v. Payne*, 203 Md. 256, 262-263, 100 A. 2d 23, 26. However, the appellees strongly urge that the exceptions violate the rule requiring specific and particular exceptions to such a report. *Young v. Omohundro,* 69 Md. 424, 431-432, 16 A. 120.

It appears from the briefs that although Maryland did not file formal, specific exceptions to the report of the auditor and master, it did submit to the trial court a lengthy document setting forth its objections to the report and that this was considered by the court. The wide scope of the order of reference and the actual proceedings under it and the report of the auditor and master all show that what was before the trial court for its actual adjudication went considerably beyond a mere statement of account. Though precise exceptions, such as were filed by the appellees, would have been helpful in sharpening the issues, before the trial court, and perhaps on appeal as well, it appears that all of the questions presented to us were passed upon by the trial court, with the exception of the validity of the order of reference. The appellant's contention on that point has already been rejected. Under the above circumstances, we do not think that Maryland's

appeal should be dismissed for failure to file specific exceptions. By this, we do not wish to be understood as approving the very general form of "exceptions" filed by the appellant.

(2) Compliance or Non-Compliance with Rule 39. The appellant has based the statement of facts contained in its brief essentially upon only such testimony or other evidence as supports its contentions; and likewise in its appendix it has included generally only such matters (other than some of the pleadings, the order of reference, the report of the auditor and master and the final order of the court) as it must have considered favorable to its contentions. We think that in the statement of facts there should have been at least a candid admission that the facts were in controversy and were largely resolved below in favor of the appellees, even though this could and would be ascertained from the report of the master and the order confirming it, which are contained in the appendix.

The appellant's statement of facts and appendix together fall far short of presenting all of the data which is necessary to enable this Court to determine the questions presented for decision.

The appellees have appropriately set forth their own contentions as to the facts and have included in their appendix material supporting those contentions. With the aid of the material so furnished, we believe that the case has been adequately presented, and it has been fully argued on the merits. The Court has considered the case on the merits and will deny the motion to dismiss Maryland's appeal and will proceed to determine both appeals on the merits as now presented.

Accordingly, the motion to dismiss Maryland's appeal is denied.

### The Original Claim.

In the late summer of 1950, Mr. Fabian Kolker, Vice-President of Maryland, telephoned Mr. H. A. White in Seattle, to find out if White could supply some plywood. The two companies had done business for about

a year and a half previously. As a result of a car shortage then existing, in order to ship plywood from the West Coast to the East it was frequently necessary to start a freight car from the northwest lumber region with a partial lading of lumber and to route it through the plywood country, where the plywood cargo could be loaded into it, and the car would then be forwarded eastward. Mr. White testified that he and Mr. Kolker discussed this situation and agreed that a carload of lumber and plywood should be shipped. Mr. Kolker admitted that Mr. White informed him of the necessity of including some lumber in the car in order to get a car for plywood, but added that Maryland never ordered the lumber and did not need it.

White shipped a carload of lumber and plywood in a car (ACL 52883) consigned to the H. A. White Lumber Company, Baltimore (Calvert Station) by a uniform straight bill of lading. Although Maryland had sometimes been the consignee on previous occasions, the bill of lading in this transaction shows "H. A. White Lumber Company" as both consignor and consignee. The delivering carrier placed a number of cars, including ACL No. 52883, on the private siding of Maryland. The master characterized this as an "inadvertent" error.

By the time that the car arrived in Baltimore, plywood had grown scarcer and more dear but the price of lumber had fallen sharply. Maryland complained by telephone about the fall in the price of lumber and about the grade of plywood and White agreed to a concession of $150 in the price of the lumber. On October 26, Maryland notified White that the contents of the car would not be accepted.

The appellant's version is: "Upon examination of the aforesaid car 'ACL No. 52883', it was discovered that the said car contained 'lumber' as well as 'plywood', while the Maryland Lumber Company had ordered 'plywood' only; that immediately upon the aforesaid discovery, and on October 26, 1950, the Maryland Lumber Company communicated by Telephone with H. A. White,

advising him of its refusal to accept the aforesaid car and requested him to divert same. The said H. A. White accepted the refusal of the car and advised the Maryland Lumber Company that diversion instructions will follow immediately."

On October 27, Maryland wired White that it was waiting for diversion instructions on car plywood ACL 52883.

On October 28, Maryland received from White a night letter dated October 27, stating that White sold on current West Coast terms of condition and quotation of sale and refusing to accept cancellation of another car and of this one and concluding as follows: "We have offer on this car at $200 under our cost represented by fall in fir market. Please advise if this acceptable to you and we will divert for your account."

The master summarized the events leading to these telegrams: "White testified that he had talked to Mr. Kolker on the phone five times on the 27th, and that he had told Kolker he would not accept the cancellation of the car. However, on the same day, White testified he agreed to accept the cancellation, or, to use a term which White later insisted upon, agreeing to 'divert' the car. Nevertheless, White sent Maryland a Night Letter, dated October 27, 1950, which Maryland received on October 28, 1950, refusing to accept cancellation of this car. Because of the difference in time and the further fact that one was a Night Letter, it is difficult to state in what order these messages were received. * * * [Mr. White testified] he was 'hoping to bluff' Kolker into keeping the car and 'we knew he couldn't get at the car without sending us the money on a c.o.d. basis.' "

A circular dated October 27, 1950, was distributed by White advertising, among other carload lots of lumber, *"Car ACL 52883*—being held in Baltimore, Md., by PRR for diversion," and describing the contents of the carload. On October 30, 1950, White began negotations to sell the subject carload to Baltimore and the

194

sale was agreed to sometime during October 31st, 1950. On November 1st, Maryland received from the White Lumber Company a night letter dated October 31st and reading: "ACL 52883 released today 4:45 PM via Seattle representative PRR to Baltimore Lumber Company."

There was also some testimony by Mr. White to the effect that he and Mr. Kolker agreed by telephone between October 27th and 31st to Maryland's cancellation of the order for this carload.

The master's observation that "Undoubtedly, both White and Maryland did considerable jockeying between October 26, 1950 and November 1, 1950" is amply justified.

There is considerable conflict in the testimony as to when the car in question was unloaded. Maryland claimed to have unloaded it on October 28th after receiving White's night letter of the 27th. Against this was testimony of Dan Schloss, one of the plaintiffs, and testimony of an employee of the Railroad. The master found that Maryland did not begin to unload it until November 1st. He further reported: "I have made a careful analysis of the facts disclosed by the evidence, which leads me to this finding: There is a clear inference that Maryland's sudden determination to keep the contents of the car occurred when Mr. Kolker learned that White and Schloss were negotiating for a sale thereof to Baltimore Lumber. Learned counsel for Maryland, in his very able oral arguments, stressed the fact that relations between Maryland and Baltimore Lumber were strained beyond the usual limits of keen competition, and there is evidence to support this. Maryland admittedly needed the plywood to carry out its commitments to its customers, and although Maryland knew that it would sustain a loss on the lumber, it preferred to take that loss which was not substantial, rather than allow Baltimore Lumber to get the plywood, which had increased in value. I believe that Maryland, after weighing the advantages and disadvantages,

promptly decided to retain the contents of the car before White's deal with Baltimore Lumber could be consummated."

After November 1st, negotiations continued between Maryland and White. Despite the conflict as to when Maryland took possession of the lumber and plywood, there seems to be no doubt that it did so, that it distributed them to its customers, and that Baltimore never received the contents of the car. There were a number of communications between Maryland and White. There was also one telephone call from Mr. Kolker of Maryland to Mr. Dan Schloss of Baltimore, which was unproductive. It would serve no useful purpose to detail the communications between White and Maryland. In substance, White took and consistently maintained the position, so long as the negotiations lasted, that the matter could be disposed of by Maryland's paying the invoice price of the lumber and plywood, less an allowance of $150 because of the decline in the market price of fir, and upon Maryland's furnishing White with a complete release from Baltimore. Maryland never complied with the latter condition and never agreed to do so. It sent White a check for the price of the lumber and plywood, which White held for about a month and then returned because of Maryland's not having complied with the terms of White's offer. This suit was instituted in March, 1951.

The special auditor and master to whom this case was referred is one of the standing Masters in Chancery for the Equity Courts in Baltimore City and is a lawyer of ability and experience. For all practical purposes, he was accepted by all parties as the initial trier of facts, with the right reserved, of course, to ask the judge of the trial court in which the case was pending to review the master's findings of fact and conclusions of law. (Neither side sought a jury trial.) The case comes to this Court, we think, in substantially the same position as if the suit were one in equity in which the chancellor had, with the consent of the parties, referred contro-

verted issues to a master for hearing and report. The master in this case saw and heard the witnesses and made his report on the facts and the law which the court approved and adopted after hearing exceptions and objections from both sides; and judgment was entered in accordance with the master's findings and recommendations. Findings of fact so made and approved should not be set aside by this Court unless clearly erroneous. (See Rule 9 (c), General Rules of Practice and Procedure, Part Three, III.)

The review of the facts which we have given above and a study of the appendices shows that there was substantial evidence to support the master's findings of fact both on the question of original conversion and on whether or not a subsequent agreement had waived any claim for conversion.

Taking up the latter question first, we think that the evidence was more than sufficient to sustain the finding that after November 1st, 1950, no agreement was reached between White and Maryland with regard to the carload of lumber and plywood alleged to have been converted by Maryland. Since there was no such agreement, because of Maryland's not meeting one of the terms of the proposed agreement which was insisted upon by White, Maryland's contention that the "agreement" amounted to an abandonment of White's claim for conversion and a ratification of Maryland's retention of the goods necessarily fails. It is likewise unnecessary to consider what, if any, authority White had from Baltimore to make a binding agreement on behalf of the latter; and in view of White's insistence throughout the negotiations that Maryland obtain a release of any claims which Baltimore might have, the question seems academic.

A major question in the case is whether or not there was a conversion of the lumber and plywood by Maryland. The special master found in effect that Maryland had unloaded the car and had appropriated the contents to its own use after cancellation of the contract for the

sale thereof had been agreed to by White and Maryland. He also concluded, as a matter of law, that even if the cancellation had not been agreed to, Maryland had not acquired any right of property or possession in the contents of the car, because the car had been consigned to the seller and so remained up to whatever may have been the actual time of the car being unloaded by Maryland.

On the facts, we think that the appellant has failed to establish that the findings that the unloading of the car and appropriation of the contents by Maryland occurred after the cancellation or rescission of the contract of sale between White and Maryland are "clearly erroneous." On the contrary, the weight of the evidence on the question, which has already been summarized, seems to us to support the findings of fact above stated.

This conclusion makes it unnecessary to take up the appellant's next contention, which is that, under Code (1951), Article 83, Section 38(2), it had the right to unload the car and take over the contents. Any such right (which we think never existed at all because Maryland neither paid for the material nor obtained an order from White to release it before Maryland took possession of it) would necessarily have terminated with the cancellation or rescission of the contract, which occurred prior to the date on which Maryland was found to have taken possession of the contents of the car.

The same finding as to the facts also establishes that the conversion was actual, and not merely constructive, and hence no demand and refusal were necessary. See *Martin v. Lanahan*, 133 Md. 525, 105 A. 777; *Dietus v. Fuss*, 8 Md. 148; *Hammond v. DuBois*, 131 Md. 116, at 151-152, 101 A. 612.

The appellant's contention that the market value of the lumber and plywood was fixed by White in negotiations with Maryland looking towards settlement after November 1, 1950 is unsupportable. Again, on this point, we think that there was substantial testimony

to support the finding of the master which was approved by the trial court as to market value at the time of conversion. The judgment below was based on this finding and interest was allowed on the amount so found. The appellant challenges the allowance of interest because of the tender of a check in payment of the invoice price during the negotiations looking towards settlement. Maryland did not see fit to accept White's offer and made what was in effect a counter-proposal, and the check was sent as a part of the counter-proposal. White declined to accept the counter-proposal or the check. This, we think, was not such a tender as would stop the running of interest, and we see no error in its allowance.

The appellant objects to an allowance for loss of profit on resale being included in the judgment in favor of Baltimore. Its objection is based upon facts which were determined against it in the trial court, and that determination is sufficiently supported by the evidence. We think its inclusion was proper in view of the inability of Baltimore to replace the merchandise under then existing market conditions in order to make delivery to its customer. See *Restatement of Torts,* Section 911.

The appellant claims that under Code (1951), Article 50, Section 23 (which is a part of the Uniform Contribution Among Tortfeasors Act as enacted in this State), it is entitled to a credit of $400, representing the consideration paid by the Railroad for the order of satisfaction in its favor. That this was the consideration is shown by both the statement of the case in the appellant's brief, and by a statement in the corresponding portion of the appellees' brief, that the order was delivered "in consideration of a check of Four Hundred Dollars ($400), which has never been cashed." The appellees' election not to cash it is immaterial. See *Berkley v. Wilson,* 87 Md. 219, at 223, 39 A. 502.

The statute does not define the term "release". In cases prior to its enactment, a covenant not to sue and

an order "agreed and settled" were treated as releases in *Lanasa v. Beggs,* 159 Md. 311, 151 A. 21, and the order "agreed and settled" in *Cox v. Maryland Electric Rwys. Co.,* 126 Md. 300, 95 A. 43, respectively. We do not think that the statute narrows the meaning of the term.

It appears that before this case was referred to the auditor and master the appellant claimed to have been completely discharged by the delivery of the order of satisfaction to the Railroad on the theory that the release of one joint tortfeasor operated to release the other and that a motion based thereon was overruled by the trial court. It also appears that the appellees took the position that this claim made by the appellant was "in flagrant disregard of the Joint Tortfeasor's Act" and specifically referred to the section of the Code upon which the appellant now relies.

Later, in his report, the master expressed the opinion that this transaction was not tantamount to a release under Section 24 [probably Section 23 was intended] of Article 50 and disallowed the deduction and his opinion and disallowance were approved by the trial court.

Though there is little about the matter in the briefs and appendices it appears that the applicability of the statute was before the trial court and was decided by it. There was no apparent dispute as to the facts involved and the question was determined as one of law. In its disposition we think there was error. Before the statute, the appellees would have been entitled to only one satisfaction for the tort, even though two or more parties might have contributed to causing their loss, and this rule is not changed by the statute relating to contributions. See *Berkley v. Wilson, supra; Cox v. Maryland Electric Rwys. Co., supra; Lanasa v. Beggs, supra;* all decided before the statute. See also *Western Maryland Dairy Corp. v. Brown,* 169 Md. 257, 181 A. 468. Cf. *Elling v. Travers,* 162 Md. 597, 160 A. 789; *Yellow Cab Co. v. Bradin,* 172 Md. 388, 191 A. 717. The two cases last referred to, and the *Lanasa* case as well, show

that if one of several parties involved in an accident is free of any negligence, a release given to him only by an injured party may not have any effect upon the liability of the others. In the present case, however, the evidence shows at least a *prima facie* case that the Railroad delivered the car in question to Maryland without proper authorization from the consignee, White. The appellees joined the Railroad as a defendant and charged it with conversion by misdelivery. Ordinarily misdelivery, unless excused, will sustain such a charge. 9 *Am. Juris., Carriers,* Section 581, page 773.

We accordingly think that in this case the order of satisfaction in favor of the Railroad operated as a release within the meaning of Section 23 of Article 50 and with the effect (but no more than the effect) therein provided, and that the claim against the other tortfeasor should be reduced by the amount of the consideration paid for the order of satisfaction.

### The Cross-Claim.

The appellant seeks the allowance of substantial damages against White for the breach of several alleged contracts for the sale of plywood. The master found and the trial court confirmed his findings that Maryland's orders were not accepted by White and hence that no contracts based upon them had been entered into. The evidence, we think, is sufficient to support this finding. It is, therefore, unnecessary for us to pass upon the further finding that there was no sufficient memorandum to satisfy the requirements of the Statute of Frauds (Code (1951), Article 83, Section 22) because of the indefiniteness of terms as to price.

The evidence, we think, is also sufficient to support the finding of the master and of the trial court that White was entitled to a credit of $241.73 against Maryland for unearned discount.

The remaining disputed item is in the amount of $1,030.32. It is based upon a claim by Maryland that some 324 doors included in a carload shipment were substandard. Other doors in the same shipment were admittedly below the proper quality. They were dis-

posed of at a price of $4.00 apiece and they are not the subject of controversy in this case.

The sale of these doors was made under the "West Coast Rules" governing sales and shipments of forest products. One of the provisions of these Rules is that:

"Acceptance and use by the buyer of a portion of the shipment shall not be construed as his acceptance of the entire shipment. The buyer shall pay in accordance with the terms of sale for the portion which he accepts; but his acceptance of a part of a shipment does not prejudice his just claim on account of any unused material which is alleged by him to be below the grade, or not of the size, ordered."

The master found that White had waived compliance with the West Coast Rules by a letter dated August 7, 1950 from White to Maryland. This letter enclosed an invoice covering the shipment, confirmed verbal authority from White to Maryland to unload the car and "segregate the below grade doors out," promised an adjustment "on these pieces" after final count, stated that payment by Maryland of 80% of the invoice within the discount period would protect its full discount rights and requested prompt advice as to the result of Maryland's inspection of the doors. Undoubtedly, provisions of the West Coast Rules regarding time for claims and for a discount were waived; but insofar as the particular rule above quoted was concerned, this letter seems to be in full accord with its terms and not to constitute a waiver of it. There is no dispute about the terms of the letter; and as a matter of law, we disagree with the construction which was placed upon it by the master and adopted by the trial court.

Though the master's report referred to an allowance on these doors which White "apparently agreed to" during a conference looking towards settlement as being in an amount which he considered fair to both sides, he did not rely upon it as an evidence of waiver, nor did the trial court indicate any different view. Our holding that the rule with regard to the contract price

applying to such part of the doors as were accepted was not waived, makes it unnecessary to pass upon the market value or the fair value of the doors. There was no direct testimony on the point. The contract price was $6.43 per door. The resale price (to a third party) of the doors which Maryland rejected and which were almost surely worth less than those which it retained was $4.00 apiece. They were sold in or about January, 1951, which was more than two years prior to the unsuccessful settlement conference in which a figure of $3.25 per door was "apparently agreed to." It is also unnecessary to decide to what extent, if any, a figure developed in an attempt at compromise could be considered. Certainly, it was not binding.

The two relatively minor matters as to which we have reached conclusions contrary to those of the special master and of the trial court call for adjustments in the amounts of the judgments, which can be disposed of by our mandate without awarding a new trial. The judgment in favor of Baltimore and of White on the original suit against Maryland should be reduced by $400 from $8,880.79 to $8,480.79, and the judgment in favor of Maryland and against White on Maryland's cross-claim should be reduced by $1,030.32 from $1,446.01 to $415.69, with interest on each from the date of the rendition of the original judgment, and with costs to Baltimore and to White on both the original suit and the cross-claim.

> *Judgment for appellees on the original suit reduced by $400 and, as reduced, affirmed in the amount of $8,480.79, with interest from October 28, 1953, and with costs to the appellees; Judgment for appellee on the cross-claim reduced by $1,030.32 and, as reduced, affirmed in the amount of $415.69, with interest from October 28, 1953, and with costs to appellant on the cross-claim.*