MATTER OF ANDERSON, EPPS, SMITH AND BRADY

[No. 8 (Adv.), September Term, 1974.]

*Decided June 26, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Peter S. Smith,* with whom was *Michael S. Elder* on the brief, for appellants.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Petitions were filed at various times in the Circuit Court of Baltimore City, Division for Juvenile Causes (Juvenile Court), charging that William Anderson, Michael A. Epps, Larry Smith, and Donald Brady (the juveniles) were delinquents. *See* Maryland Code (1957, 1973 Repl. Vol.) Art. 26, §§ 51-71 for the statute then applicable.

A "delinquent child" was defined in § 70-1 (h) as "a child who commits a delinquent act and who requires supervision, treatment, or rehabilitation." A "delinquent act" was defined in § 70-1 (g) as "an act which is in violation of Article 66½ of [the Maryland] Code, any other traffic violation, or an act which would be a crime if done by a person who is not a child." [1]

Pursuant to the provisions of Maryland Rule 908 e 1, testimony was presented to a master in each case. In each instance he submitted a recommendation to the judge presiding in that court that an order be entered dismissing the petition. The State's attorney, as authorized by Rule 908 e 2, filed written exceptions to the master's recommendation on behalf of the petitioner in each case. Rule 908 e 3 provides:

> "In the absence of exceptions, the master's findings and recommendations shall promptly be confirmed, modified or remanded by the judge. If, within the specified time, exceptions are filed, the

---

1. By § 70-2 (d) (2) there was excluded from the jurisdiction of the Juvenile Court any "proceeding involving a child who ha[d] reached his 16th birthday, alleged to have done an act in violation of any provision of Article 66½ or any other traffic law or ordinance" except for certain of the more serious offenses involving motor vehicles. Basically the same provision is now found in Code (1974) § 3-808 (2), Courts and Judicial Proceedings Article.

judge shall hear the entire matter or such specific matters as set forth in the exceptions *de novo.*"

The juveniles challenged the exceptions. They contended that the provision for a hearing de novo was in conflict with the double jeopardy clause of the Fifth Amendment of the Constitution of the United States. The trial judge (Hammerman, J.) made a finding favorable to them.

The State appealed to the Court of Special Appeals. In *Matter of Anderson,* 20 Md. App. 31, 315 A. 2d 540 (1974), that court reversed the lower court and remanded the cases with directions that the petitions be heard de novo by the juvenile judge. We granted certiorari in order that we might consider the contentions of the juveniles (1) that the State had no right of appeal, (2) that the double jeopardy clause of the Fifth Amendment is applicable to juvenile proceedings, and (3) that Rule 908 e 2, "to the extent that it permits the State to except to a master's finding of non-delinquency and obtain a de novo trial, violates the double jeopardy clause of the Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment."

I

The juveniles urge here, as they did in the Court of Special Appeals, that the State has no right of appeal. They base this contention upon their reading of Code (1957, 1973 Repl. Vol.) Art. 26, §§ 70-1 (e) and 70-25, in effect at the time the orders for appeal to the Court of Special Appeals were filed in these cases. Provision is made for appeal in § 70-25. It states in pertinent part:

"An aggrieved party may appeal from any final order, judgment, or decree of the juvenile court to the Court of Special Appeals in the manner prescribed by the Maryland Rules."

"Party" is defined in § 70-1 (e) as "a child named in a petition, or his parent, guardian or custodian." Although not mentioned by the juveniles, reference to Chapter 432 of the Acts of 1969, completely revising the juvenile law in

Maryland and providing the statutory base for § 70-1 and § 70-25, reveals that as originally introduced in the General Assembly no definition of "party" appeared. It was introduced in the form in which it came from a special subcommittee of the Legislative Council. *See* 1 Legislative Council of Maryland, *Report to the General Assembly of 1969*, at 131-42 (1968). The present definition was added by amendment in the General Assembly.

Chapter 2 of the Acts of 1973 of the First Extraordinary Session of the General Assembly enacted new provisions of the Maryland Code dealing with courts and the judiciary, being now codified as Code (1974) Courts and Judicial Proceedings Article. Matters dealing with appeals were placed in Title 12 of that article. Sec. 12-301 provides, with exceptions not here pertinent, that "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." "Circuit court" is defined in § 12-101 (d) as including the Circuit Court of Baltimore City. The appeals to the Court of Special Appeals in these cases were taken prior to the effective date of the new code. The right of appeal must be determined under the law in effect at the time of the appeals.

Chief Judge Orth pointed out for the Court of Special Appeals that in *Welch v. Humphrey*, 200 Md. 410, 90 A. 2d 686 (1952), this Court said:

"It is true that a codification of previously · enacted legislation, eliminating repealed laws and systematically arranging the laws by subject matter, becomes an official Code when adopted by the Legislature, and, since it constitutes the latest expression of the legislative will, it controls over all previous expressions on the subject, if the Legislature so provides. However, the principal function of a Code is to reorganize the statutes and state them in simpler form. Consequently any changes made in them by a Code are presumed to be for the purpose of clarity rather than change of meaning. Therefore, even a change in the

phraseology of a statute by a codification thereof will not ordinarily modify the law, unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code. *Welsh v. Kuntz,* 196 Md. 86, 97, 75 A. 2d 343, 347." *Id.* at 417.

Judge Orth then concluded that the State had the right to appeal from the orders dismissing the charges against the juveniles, saying:

"There being no limitation on the meaning of 'party', and the State as a party in juvenile causes not being within the exceptions designated in § 12-302, the State may appeal from a final judgment entered in a juvenile case by a circuit court. As this was the clear legislative intent in enacting § 12-301, it was the intent of Art. 26, § 70-25." *Id.* at 20 Md. App. 40.

We agree with the conclusion of the Court of Special Appeals that a right of appeal on the part of the State existed, but we reach our conclusion by a somewhat different route. Code (1957, 1968 Repl. Vol., 1973 Cum. Supp.) Art. 5, § 6, in effect at the time of these appeals, stated in pertinent part:

"Any party may appeal to the Court of Appeals from any final decree, or order in the nature of a final decree, entered by a court of equity unless the final decree or order is entered in a case or proceeding subject to the appellate jurisdiction of the Court of Special Appeals, in which event any party may appeal to the Court of Special Appeals from any such decree or order."

The parties are under the impression that the equity courts when sitting as juvenile courts are exercising "a special or limited jurisdiction" and are not acting "according to the ordinary course of the common law" as those terms are used in *Simpler v. State, Use of Boyd,* 223 Md. 456,

460-61, 165 A. 2d 464 (1960), and thus that the right of appeal can come only under § 70-25. We do not see it that way. Equity has long been concerned with infants. For instance, *Barnard v. Godfrey*, 157 Md. 264, 145 A. 614 (1929), concerned what is now Code (1957, 1973 Repl. Vol.) Art. 16, § 66 providing that "[t]he several equity courts of this State shall have original jurisdiction in all cases relating to the custody, guardianship, maintenance and support of legitimate and illegitimate children . . . ." Judge W. Mitchell Digges there said for the Court:

> "This section is declaratory of the inherent power of courts of equity over minors . . . ." *Id.* at 267.

To like effect, *see, e.g., Taylor v. Taylor*, 246 Md. 616, 619, 229 A. 2d 131 (1967), and *Coleman v. Coleman*, 228 Md. 610, 613, 180 A. 2d 875 (1962). *Cf. Montchester v. Honga River*, 257 Md. 79, 84-85, 262 A. 2d 312 (1970). We there said that Art. 15, relating to bounding lands as enacted by Chapter 33 of the Acts of 1786, probably involved "a regular exercise of the court's general jurisdiction in the ordinary course of the common law, from which an appeal would normally lie under Article 5, Section 1."

Divorce was a subject not cognizable by our chancery courts prior to the enactment of Chapter 262 of the Acts of 1841. *Rubin v. Rubin*, 233 Md. 118, 124, 195 A. 2d 696, 99 A.L.R.2d 256 (1963); *Foote v. Foote*, 190 Md. 171, 176, 57 A. 2d 804 (1948); and *Emerson v. Emerson*, 120 Md. 584, 589, 87 A. 1033 (1913). Similarly, prior to enactment of Chapter 220 of the Acts of 1947, Maryland equity courts were without power, upon granting a divorce, to determine ownership of personal property of the parties and to apportion the property between them. *Gebhard v. Gebhard*, 253 Md. 125, 129-30, 252 A. 2d 171 (1969); *Brucker v. Benson*, 209 Md. 247, 250-51, 121 A. 2d 230 (1956); and *Lopez v. Lopez*, 206 Md. 509, 515-17, 112 A. 2d 466 (1955). Yet, it is under Art. 5, § 6, that appeals from those actions are taken.

The view that creation of additional equity jurisdiction does not necessarily create "a special or limited jurisdiction" is reinforced by reference to *Williams v. Williams*, 7 Gill 302 (1848). By Chapter 181 of the Acts of

1833 provision was made, relative to mortgages in Baltimore City, for the mortgagors to assent in each instrument to the passage of a decree for sale of the mortgaged premises and for the appointment of a trustee to make sale in the event of their default. It was contended "that in passing decrees under this Act the Court of Chancery exercises only 'a special and limited jurisdiction,' which in such cases excludes the right of appeal unless expressly given by the Act that creates the peculiar jurisdiction," as in certain cases cited. Our predecessors said:

> "It cannot be assumed, that the Legislature thus constructively intended to abridge a right, so fully recognized within the general Chancery jurisdiction, and, as to the subject under consideration, convert that Court into one of special and limited powers; thus repealing the old and time-sanctioned provision in favor of justice and right, that 'any person aggrieved by a decree in Chancery shall have his appeal,' 1721, ch. 14, sec. 3. The motion is overruled." *Id.* at 306.

This Court commented upon § 6 as it then stood, referring to a right of appeal "by any one or more of the persons parties to the suit," in *Preston v. Poe,* 116 Md. 1, 81 A. 178 (1911), stating:

> "While it has been held that this provision does not restrict the right of appeal to those who are technical parties to a suit, yet it is also well settled that an appellant must be able to show that he has a direct interest in the subject-matter of the litigation. *Hall v. Jack,* 32 Md. 262; *Rau v. Robertson,* 58 Md. 508; *Grabill v. Plummer,* 95 Md. 60; *Cecil v. Cecil,* 19 Md. 72; *Johns v. Caldwell,* 60 Md. 259; *Lurman v. Hubner,* 75 Md. 268; *Haskie v. James,* 75 Md. 568; *Stewart v. Codd,* 58 Md. 86; *Frey v. Shrewsbury Bank,* 58 Md. 151; *Glenn v. Reid,* 74 Md. 238; 2 *Cyc.* 628, 629. In the first of the cases just cited, which was relied upon by the appellant in this connection, the decree from which the

intervenor appealed not only dismissed his petition but concluded his rights in respect to the fund in controversy. It was held, therefore, that, while not a technical party to the suit, he had such an interest in the subject of the litigation as to entitle him to maintain the appeal." *Id.* at 6.

Chief Judge Brune fully discussed this subject for the Court in *Kreatchman v. Ramsburg*, 224 Md. 209, 215-17, 167 A. 2d 345 (1961). To like effect, see E. Miller, *Equity Procedure* § 354 (1897), and the recent cases of *Prince George's Co. v. Laurel*, 262 Md. 171, 176-77, 277 A. 2d 262 (1971); *Planning Commission v. McCaw*, 246 Md. 662, 669-72, 229 A. 2d 584 (1967); and *First Union v. Bottom*, 232 Md. 292, 295-96, 193 A. 2d 49 (1963). The interest of the State in this matter is borne out by Rule 908 e (2), providing that exceptions by a petitioner to a master's findings or recommendations relative to delinquency "may only be taken by the State's attorney." The State's position as *parens patriae* is deeply involved in juvenile proceedings. Accordingly, we have no difficulty in concluding that the State was a party within the meaning of Art. 5, § 6, then in effect, and, therefore, the appeal was properly filed.

## II

Before the holding in *Benton v. Maryland*, 395 U. S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969), that the double jeopardy clause of the Fifth Amendment to the Constitution of the United States was incorporated into the due process clause of the Fourteeth Amendment and, therefore, applicable to the states, this Court held that the common law rule against double jeopardy in effect in Maryland did not bar prosecution of an individual in one of the circuit courts after adjudication as a delinquent in a juvenile court.[2]

---

2. It is ironic that it should be a Maryland case in which the Supreme Court thus extended this doctrine since J. Sigler, *Double Jeopardy* (1969), citing as his authority 2 Elliot, *The Debates on the Adoption of the Federal Constitution* 548-49 (2d ed. Washington 1881), states:

"Maryland was the seventh state to approve the United States Constitution. completing ratification on April 26, 1788. After

*Moquin v. State,* 216 Md. 524, 140 A. 2d 914 (1958). For the purposes of our decision today we need go no further than to assume, *arguendo,* that a finding that an individual is a delinquent under the terms of the juvenile act then in force, now codified as Code (1974) §§ 3-801 to 3-842 incl., Courts and Judicial Proceedings Article, places him in jeopardy so that a second proceeding relative to the same incident would be barred.

## III

These cases arose in the Circuit Court of Baltimore City. In the 23 counties of Maryland a court "to be styled the Circuit Court for the County, in which it may be held" is created by Maryland Constitution Art. IV, § 20. It is vested with "all the power, authority and jurisdiction, original and appellate, which the . . . Circuit Courts of this State [had and exercised in 1867], or which may [t]hereafter be prescribed by law." This includes jurisdiction in criminal, law, and equity cases. In Baltimore City, however, a number of separate courts are created by the Constitution. By Art. IV, § 30 the Criminal Court of Baltimore is vested with the criminal jurisdiction, while by § 29 the Circuit Court of Baltimore City is granted "exclusive jurisdiction in Equity within the limits of said city." It has shared that equity jurisdiction with the Circuit Court No. 2 of Baltimore City since its establishment by Chapter 194 of the Acts of 1888 under the authority of Art. IV, § 39 of the Constitution. In *Capron v. Devries,* 83 Md. 220, 34 A. 251 (1896), our predecessors said:

"It can hardly be established that the Legislature has not the power to enlarge the jurisdiction of

ratification, the state appointed a committee to report such amendments to the Constitution as were thought necessary. The committee agreed to thirteen amendments. The second proposed amendment was that there should be 'no second trial after acquittal.' In this highly attenuated form, the double jeopardy concept was to be proposed for inclusion in the Constitution before the first session of the new Congress of the United States. But it was not to emerge as the officially established double jeopardy policy of the United States in this shrunken version." *Id.* at 28.

> equity. The system of equity jurisprudence has been of steady growth ever since its origin; sometimes by the effect of judicial decisions; and sometimes by statute law." *Id.* at 224.

The juveniles in their arguments here have ignored this background of the tribunal in which their cases were docketed, a background which we recognized by implication, at least, in *Matter of Miles*, 269 Md. 649, 309 A. 2d 289 (1973).

Originally, juvenile matters in Maryland were not handled in equity. Provision for a special judicial officer to handle juvenile matters came into Maryland law with passage of Chapter 611 of the Acts of 1902. It authorized the appointment in Baltimore City of a "Magistrate for Juvenile Causes" to "have exclusive jurisdiction of all cases of trial, or commitment for trial, or of commitment to any reformatory or other institution, of all minors under sixteen years of age . . . ." Judge Charles E. Moylan, Sr., in *Comments on the Juvenile Court*, 25 Md. L. Rev. 310 (1965), states that the first juvenile court in the United States was established in Chicago in 1899.

In 1940 Governor Herbert R. O'Conor appointed a Juvenile Delinquency Commission "to consider the whole field of the treatment of juvenile delinquency in Maryland, and to report its findings to the Governor and to the General Assembly at its session of 1941." *Report of Juvenile Delinquency Commission* (1941) states:

> "Baltimore is the only large city in the United States whose Juvenile Court judges are Justices of the Peace." *Id.* at 16.

Accordingly, it recommended "an enabling amendment to empower the Legislature to establish a Juvenile Court in Baltimore City." Chapter 824 of the Acts of 1941 proposed a constitutional amendment creating "[a] Juvenile Court . . . for Baltimore City" and authorizing the General Assembly to "establish a Juvenile Court for any other incorporated city or town or any county of the State."

This proposed amendment drew the fire of, among others,

the late Samuel K. Dennis, then Chief Judge of the Supreme Bench of Baltimore City. *See* S. Dennis, *Criticisms and Suggestions Relating to Existing and Proposed Juvenile Courts for Baltimore and for the Counties,* The Daily Record (Baltimore), Feb. 19, 1942. The *Report of the Maryland Commission on Juvenile Delinquency* 71 (1943) states that the proposed amendment was defeated at the general election on November 3, 1942, and that "[t]he Commission on the Judiciary Article of the Constitution of Maryland (commonly known as the Bond Commission) opposed the adoption of this Amendment in the belief that Juvenile Courts with adequate powers and jurisdiction [could] be constitutionally provided by statute, and that, therefore, there [was] no necessity of a Constitutional Amendment." It also stated in its report:

> "[The Bond] Commission further expressed the opinion that, as a practical matter, in order to avoid the multiplication of courts, a juvenile court in Baltimore City should be a branch of the Supreme Bench, and that a judge of that bench qualified for such work should continue to serve in juvenile matters without rotation in order to promote the most effective administration." *Id.* at 71.

It said at page 73 that it "accept[ed] the view that our present courts, that is the Supreme Bench in Baltimore City and the Circuit Courts in the several counties, have inherent jurisdiction to secure to every child in the State proper care and guidance if he or she is lacking in same, whether due to neglect, dependency, delinquency, feeble-mindedness or to a combination of two or more of these causes." It recommended:

> "Creation of a juvenile court in Baltimore city and in each county or at least in each Judicial Circuit, that shall have (1) original, exclusive jurisdiction, unless expressly waived by such courts in favor of the criminal courts, over children up to 16 years of age in all cases of delinquency, dependency, neglect, abandonment or feeble-

mindedness; (2) original jurisdiction to determine paternity in disputed cases; (3) original, exclusive jurisdiction to try, subject to the right of trial by jury unless waived, any parent, guardian or other adult for any wilful act or omission contributing to, encouraging or tending to cause any condition bringing a child within the jurisdiction of a juvenile court, as just defined; and if found guilty, to sentence any such person for any such act or omission as a misdemeanor, to pay a fine or to imprisonment, or both, within limits to be fixed by statute; such juvenile court in Baltimore city to be a part of the Supreme Bench of Baltimore City, and such juvenile courts in the Counties to be parts of the existing circuit courts." *Id.* at 85-86.

We surmise that Chapter 818 of the Acts of 1943 was passed as a result of the recommendation of that Commission that "[i]n addition to the jurisdiction [then] possessed and exercised by the Circuit Court of Baltimore City, said Court [should] have jurisdiction in juvenile causes as [t]hereinafter defined." That act provided for the appointment by the Supreme Bench of Baltimore City, upon recommendation of the judge assigned to exercise the jurisdiction in juvenile causes, of "a suitable person to act as Master." The master was required at the conclusion of a hearing to "transmit to the Judge all papers relating to the case, together with his findings and recommendations in writing," with the further proviso that if no hearing were requested relative to those findings and recommendations they should, "when confirmed by an order of the Judge, . . . become the judgment of the court."

By Chapter 797 of the Acts of 1945 the General Assembly provided, in what became Code (1939, 1947 Cum. Supp.) Art. 26, §§ 48A-48U, for the circuit courts to sit as juvenile courts in each of the counties of the State other than Washington, Allegany and Montgomery. The act also was not applicable to Baltimore City. One of the basic concepts of the act is made plain by its amendment to Code (1939, 1943 Supp.) Art. 26, § 58. Prior to its amendment by Chapter 818 of the

Acts of 1943, granting juvenile jurisdiction to the Circuit Court of Baltimore City, Art. 26, § 58 had provided that "[t]he Magistrate for Juvenile Causes in Baltimore City, or any county, [should] have jurisdiction in all cases of preliminary hearing of persons charged with offenses under the preceding sections of [that] sub-title, and concurrent jurisdiction with the courts upon waiver of a jury trial by the accused to hear, try and determine the case." The subtitle was "Minors Without Proper Care or Guardianship." After 1945 the provision, as amended, specified that "[t]he Circuit Court of any county, *sitting in equity for juvenile causes*, [should] have jurisdiction in all [such] cases . . . ." (Emphasis added.) This certainly made plain that it was in the exercise of equity jurisdiction that these juvenile matters were handled by the various circuit courts of the counties and the Circuit Court of Baltimore City. By Chapter 127 of the acts of 1966 the exemption in the statewide act for Baltimore City was eliminated so that the Circuit Court of Baltimore City exercised its juvenile jurisdiction under that act. Montgomery County thus became the only area of the State in which what had become Code (1957) Art. 26, §§ 51 to 70-26, incl., were not applicable.

The Legislative Council of Maryland appointed a subcommittee on juvenile causes in 1968. Its report recommended the revisions in the juvenile law which formed the basis for Chapter 432 of the Acts of 1969. Most of Code (1957, 1973 Repl. Vol.) Art. 26, §§ 51-71, under which these cases arose, was enacted by that chapter. It continued the exemption from the subtitle for Montgomery County.

Two basic questions arise when the defense of double jeopardy is raised, whether the defendant was "in jeopardy" in the prior proceeding and whether the previous charge is substantially the same as that which he faces when the defense is raised. This is what constitutes "jeopardy" and "sameness" in an offense. B. Schwartz, *Constitutional Law* § 131, at 242 (1972). Generally, as to the scope (*e.g.*, second prosecution, multiple punishments, and collateral estoppel)

and nuances (*e.g.*, manifest necessity, waiver, and separate sovereigns) of double jeopardy, *see* 3 C. Torcia, *Wharton's Criminal Evidence* § 655 *et seq.* (13th ed. 1973). It is stated in B. Schwartz, *A Commentary on the Constitution of the United States*, pt. III, *Rights of the Person*, vol. I, *Sanctity, Privacy and Expression* § 389 (1968):

> "Because second jeopardy is what is forbidden, it logically follows that the individual concerned must have undergone initial jeopardy before he can be heard to complain of another prosecution for the same offense. Thus, it becomes necessary to ascertain whether he had, in fact, been in actual jeopardy in the first prosecution. The problem of what constitutes jeopardy is essentially that of determining how many steps must have been taken and completed in a criminal trial in order that the accused can be said to have been subjected to jeopardy of life or limb therein.
>
> "The first essential for jeopardy to attach is that the proceeding be in a court having jurisdiction both over the accused and to try the offense. According to [Judge Friendly in *United States v. Sabella*, 272 F.2d 206, 209 (2d Cir. 1959)], 'we take it as true that not only an acquittal but also a conviction "before a court having no jurisdiction is, of course, like all the proceedings in the case, absolutely void, and therefore no bar to subsequent indictment and trial in a court which has jurisdiction of the offense." ' " *Id.* at 142.

Practically identical language is found in 22 C.J.S. *Criminal Law* § 241 (1961). In *Moquin*, 216 Md. 524, Judge Gray said for this Court:

> "The [double jeopardy] concept clearly contemplates that the action which bars a second prosecution must be one instituted in a court which has the *power* to convict and punish the person prosecuted for his criminal conduct. See 4

*Blackstone's Commentaries* 335. Lewis Edition at pp. 1725-26." *Id.* at 527-28. (Emphasis added.)

To like effect, *see Wampler v. Warden,* 231 Md. 639, 647, 191 A. 2d 594 (1963); *United States v. Ball,* 163 U. S. 662, 669, 16 S. Ct. 1192, 41 L. Ed. 300 (1896); *Lemieux v. Robbins,* 414 F. 2d 353, 354 (1st Cir. 1969), *cert. denied,* 397 U. S. 1017, 90 S. Ct. 1247, 25 L.Ed.2d 432 (1970); *State v. Sefcheck,* 261 Iowa 1159, 1166, 157 N.W.2d 128 (1968); *State v. War,* 38 N.J. Super. 201, 204-05, 118 A. 2d 553 (Passaic County Ct. 1955); *People v. Bishop,* 38 Misc. 2d 106, 238 N.Y.S.2d 107, 110 (Sup. Ct. 1962); and *Pickens v. State,* 393 P. 2d 889, 891 (Okla. Crim. 1964). *See also* 21 Am. Jur. 2d *Criminal Law* § 175 (1965).

The *Model Penal Code* § 1.08 (Proposed Official Draft 1962) provides further insight into the double jeopardy clause. In enumerating the circumstances under which a prosecution is barred by a former prosecution for a violation of the same provision of the statutes, § 1.08 provides:

> "(2) The former prosecution was terminated . . . by a *final order or judgment* for the defendant . . . which necessarily required a determination inconsistent with a fact or a legal proposition that must be established for conviction of the offense.
>
> * * *
>
> "(4) The former prosecution was improperly terminated. . . ." (Emphasis added.)

Virtually the same language is to be found in State of Maryland Comm'n on Criminal Law, *Proposed Criminal Code* § 5.35, at 18-19 (1972). The same substantive material is dealt with in *Model Penal Code* § 1.09 (Tent. Draft No. 5, 1956), with comments provided. Comment 3, under "Final Order or Judgment as Res Judicata," equates final order or judgment with a decision which would be appealable by the State, citing Restatement, *Judgments* § 41 (1942). Comment a to that section of the Restatement says, in part:

> "[A] decree in equity is not a final judgment if

further action by the court is required beyond the supervision of the carrying out of the decree." *Id.* at 161.

It must be borne in mind that it is not every presentation of evidence which places an individual in jeopardy. For instance, in *Wampler*, 231 Md. 639, Chief Judge Brune said:

"A preliminary hearing before a magistrate to determine whether or not there is sufficient evidence to warrant holding the accused for action of the grand jury is not a trial, the accused is not thereby put in jeopardy, and his discharge as a result of such a hearing does not bar his subsequent prosecution for the offense giving rise to the preliminary hearing. *United States ex rel. Rutz v. Levy,* 268 U. S. 390, 393; Hochheimer, *Criminal Law* (2nd Ed.), § 47, p. 62; 1 *Wharton's Criminal Law and Procedure* (Anderson Ed., 1957), § 137, pp. 305-06; 15 Am. Jur. *Criminal Law,* §§ 369, 370, p. 47; 22 C.J.S., *Criminal Law,* § 251, pp. 658-59; *Commonwealth v. Hamilton,.* 129 Mass. 479; *Kaye v. Keeper of Jail,* 145 Me. 103, 72 A. 2d 811. See also *Ocampo v. United States,* 234 U. S. 91. In the *Ocampo* case which came from the Philippine Islands, Mr. Justice Pitney, speaking for the Supreme Court, after referring to the function of committing magistrates generally as well as under the laws applicable to the Philippines, said: 'There is no definite adjudication. A finding that there is no probable cause is not equivalent to an acquittal, but only entitles the accused to his liberty for the present, leaving him subject to rearrest.' 234 U.S. 100. And in the *Rutz* case Mr. Justice Sutherland said (268 U.S. at 393): 'Under state law it has uniformly been held that the discharge of an accused person upon a preliminary examination for want of probable cause constitutes no bar to a subsequent preliminary examination before another magistrate. Such an examination is not a

trial in any sense and does not operate to put the defendant in jeopardy.' (The Court then cited a number of cases.)" *Id.* at 647-48.

In *State ex rel. Shatzer v. Warden*, 192 Md. 728, 64 A. 2d 711 (1949), the Court quoted with approval the opinion of a trial judge in denying a writ of habeas corpus:

" '[I]t has been held repeatedly in this state that when a traverser has been tried on an information that is invalid, he is not in jeopardy and that he may be indicted by the grand jury and tried again.' " *Id.* at 729.

In *Crawford v. State*, 174 Md. 175, 197 A. 866 (1938), it was held that an individual found not guilty by a Baltimore City magistrate could not rely upon the doctrine of *res judicata* in a subsequent trial in the Criminal Court of Baltimore City because the magistrate was without jurisdiction to try that particular type of case.

In *Commonwealth v. Maroney*, 423 Pa. 113, 222 A. 2d 856 (1966), an individual "argue[d] that his acquittal by a coroner's jury made his subsequent prosecution [for murder] in the court of oyer and terminer a denial of due process." The Pennsylvania court said:

"There is no basis in reason or authority for an equation of the effect of a trial jury verdict and a coroner's jury verdict for purposes of the doctrines of double jeopardy or autrefois acquit." *Id.* at 119.

*See also* 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 137, at 305-06 (1957).

There is nothing new about the concept of a master. *See* Miller, *op. cit.*, §§ 555-56. The author describes the master in § 556 as "the advisor of the court as to matters of jurisdiction, parties, pleadings, proof and in other respects where he may be of assistance to the court." As to the role of the master, Judge J. Dudley Digges said for the Court in *Bar Ass'n v. Marshall*, 269 Md. 510, 307 A. 2d 677 (1973):

"Previous opinions of this Court have discussed the

importance to be attached to the findings of fact in a master's report by the ultimate trier of fact. In those cases we have said that although the report is only *advisory*, the court should give full consideration to it, particularly with respect to the credibility of witnesses, where the testimony is conflicting. And, the master's findings of fact from the evidence are prima facie correct and they will not be disturbed unless determined to be clearly erroneous. *Bris Realty v. Phoenix*, 238 Md. 84, 89, 208 A. 2d 68 (1965); *Alexander v. Hergenroeder*, 226 Md. 559, 560, 174 A. 2d 580 (1961); *Pinkston, Tr. v. Higham*, 224 Md. 513, 522, 168 A. 2d 712 (1961); *Maryland Lumber Co. v. White*, 205 Md. 180, 196, 107 A. 2d 73 (1954)." *Id.* at 516. (Emphasis added.)

In *Bris Realty v. Phoenix*, 238 Md. 84, 89, 208 A. 2d 68 (1965), Judge Keating observed for the Court that "[o]ne of the purposes of seeking the advice and recommendations of an auditor and master is to conserve the time of the court."

In *Eastern Structural Co. v. Wor. Auditorium Co.*, 216 Mass. 426, 103 N. E. 913 (1914), the court alluded to the fact that "[o]riginally masters were appointed by the king and acted as assistants to the chancellor."

The function of a master was dealt with in detail in *Ennesser v. Hudek*, 169 Ill. 494, 48 N. E. 673 (1897). It was there said:

"A master in chancery is a ministerial officer appointed by the court to assist by performing various services, mainly of a clerical character, in the progress of a case." *Id.* at 495.

It was further stated:

"In *Boston v. Nichols*, 47 Ill. 353, . . . it was said (p. 359): 'It is not the province of the master to adjudge and finally determine upon the rights of the parties. That belongs to the chancellor, and he cannot delegate it to another. The master is a ministerial and not a judicial officer. The court

may, by special reference, require him to hear evidence and find and report facts to the chancellor, but before such finding can become binding it must be approved by the court.'

"In *Rankin v. Rankin*, 36 Ill. 293, . . . [i]t was held that . . . the action of the master is always subject to the supervision of the court.

"[In] *DeLeuw v. Neely*, 71 Ill. 473, . . . it was said of the master in chancery (p. 474): 'His duties are strictly of a ministerial character. The court has no authority to invest him with power, in the nature of judicial duties, to adjudicate upon the amount or legality of such taxes as he may discover on the collector's books. These are strictly judicial questions, and can only be settled by the court.' " *Id.* at 497-98.

Similar views are expressed in *Oteri v. Scalzo*, 145 U. S. 578, 12 S. Ct. 895, 36 L. Ed. 824 (1892); *Ferguson v. Rogers*, 129 Ark. 197, 203, 195 S.W. 22 (1917); *Leigh v. Laughlin*, 222 Ill. 265, 269, 78 N. E. 563 (1906); *Rozema v. Quinn*, 51 Ill. App. 2d 479, 201 N.E.2d 649, 654 (1964); *McMillan, Adm'r v. McNeill*, 69 N. C. 129, 130 (1873); *Higgins v. Higgins*, 205 Va. 324, 328-29, 136 S.E.2d 793 (1964); *Raiford v. Raiford*, 193 Va. 221, 229-30, 68 S.E.2d 888 (1952); 30A C.J.S. *Equity* § 521 (1965); and 27 Am. Jur. 2d *Equity* § 232 (1966).

Relative to the office of master, Miller, *op. cit.*, § 555 states:

"A master in chancery is an officer of the court who acts as an assistant to the chancellor. . . . In Maryland the office at one period existed under the inherent jurisdiction of the court of chancery, independently of statute. Masters may now also be appointed under the constitutional provision that 'the judge or judges of any court may appoint such officers for their respective courts as may be necessary.' " *Id.* at 653.

We know that in the more heavily populated areas it has been the chancery practice for generations for masters to

review testimony and other proceedings and to prepare for signature by judges, sitting as chancellors, what the master believes to be a proper decree. In all sections of the State each chancery sale is referred to a court auditor or master for the stating of an account. In none of those instances is there a decree or a final account until after the chancellor, the judge of the appropriate court, has reviewed the matter, accepted or approved it, and appended his signature. Court auditors, or masters, are empowered to take testimony, and do take testimony in some instances, for the purpose of stating an account. Nevertheless, exceptions may be filed and the matter come on for hearing before the chancellor.

Maryland Constitution, Article IV, § 1 reads:

> "The Judicial power of this State shall be vested in a Court of Appeals, and such intermediate courts of appeal, as shall be provided by law by the General Assembly, Circuit Courts, Orphans' Courts, such Courts for the City of Baltimore, as are hereinafter provided for, and a District Court; all said Courts shall be Courts of Record, and each shall have a seal to be used in the authentication of all process issuing therefrom."

Only two changes have been made in that language since the adoption of the Constitution of 1867. The constitutional amendment proposed by Chapter 10 of the Acts of 1966, ratified by the people on November 8, 1966, provided for "intermediate courts of appeal." The constitutional amendment proposed by Chapter 789 of the Acts of 1969, ratified by the people on November 3, 1970, eliminated the former reference to justices of the peace and inserted the provision relative to "a District Court." It was held in *Hagerstown v. Dechert*, 32 Md. 369, 383-84 (1870), that the General Assembly could not provide that the mayor of a town should have the powers of a justice of the peace, "nor could they vest judicial power in any other officer except such as were enumerated in the first section of the fourth Article of the Constitution." In *Woelfel v. State*, 177 Md. 494, 501, 9 A. 2d 826 (1939), it was said, citing cases, that "there is

no power in the Legislature to provide for any other courts" than those provided in Article IV, § 1 of the Constitution. Masters are not judges and, therefore, are not vested with any part of the judicial power of the State.

The recent case of *Mississippi v. Arkansas*, 415 U. S. 289, 94 S. Ct. 1046, 39 L.Ed.2d 333 (1974), is an example of the use of a special master by the Supreme Court of the United States in a case where it has original jurisdiction. Mr. Justice Blackmun there said for the Court:

> "Upon our independent review of the record, we find ourselves in complete agreement and accord with the findings of fact made by the Special Master." *Id.* at 94 S. Ct. 1047.

He concluded that opinion by saying:

> "Upon our own consideration and our independent review of the entire record, of the report filed by the Special Master, of the exceptions filed thereto, and of the argument thereon, a decree is accordingly entered." *Id.* at 94 S. Ct. 1049.

Surely no one would contend that the recommendation made by a special master after a hearing before him constitutes a final determination of the matters there in dispute. Recently, in the exercise of our own original jurisdiction in the matter of legislative redistricting, we had occasion to appoint former Chief Judge Hall Hammond as a special master. *See In re Legislative Districting*, 271 Md. 320, 317 A. 2d 477 (1974). No one would contend that Judge Hammond's recommendations to us constituted the final decision in that matter.

We have seen that Maryland juvenile practice began with those cases being heard before justices of the peace. The office of justice of the peace was described in *Quenstedt v. Wilson*, 173 Md. 11, 18, 194 A. 354 (1937), as "an ancient and honorable institution." Prior to the constitutional amendment of 1970, justices of the peace were vested with judicial power under the Constitution. We have seen that juvenile jurisdiction passed to the equity side of the circuit

courts in all of the counties of Maryland, other than Montgomery County, and to an equity court in Baltimore City. We have shown that before double jeopardy may arise one must first have been in jeopardy. We have pointed out cases holding that it is not every presentation of evidence of a possible violation of law which places an individual in jeopardy. We have cited cases and authorities to the effect that a master is a ministerial officer, and not a judicial officer. We have called attention to the fact that under the Maryland Constitution a master is entrusted with no part of the judicial power of this State, although the earlier magistrate for juvenile causes was entrusted with such power as a justice of the peace. We have pointed out that, under the Maryland Rules applicable to juvenile cases and under the procedure generally where masters are involved, a master hears evidence and then reports his findings of fact and his recommendations to the chancellor. We have also pointed out that a master's findings do not become binding until approved by a judge of the court to which he reports. Accordingly, we conclude that a hearing before a master is not such a hearing as places a juvenile in jeopardy. Therefore, double jeopardy cannot arise if the matter is heard de novo before the chancellor.

> *Judgment of the Court of Special Appeals affirmed and each of the cases remanded with direction to the Juvenile Judge to hear the respective petitions de novo; mandate in each case to issue forthwith.*