ATTORNEY GENERAL OF MARYLAND ET AL.
*v.* JAMES JOHNSON ET AL.

[No. 108, September Term, 1977.]

*Decided April 5, 1978.*

*Motion for reconsideration filed April 21, 1978; denied April 21, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Angus R. Everton, Stephen J. Sfekas, Assistant Attorney General,* and *John F. King,* with whom were *Anderson, Coe & King* on the brief, for appellants.

*Marvin Ellin* and *Jonathan Schochor,* with whom were *Ellin & Baker* on the brief, for appellee James Johnson. *James L. Thompson,* with whom were *Arthur S. Feld, Robert R. Michael, Alan S. Feld* and *Virginia R. Huebner* on the brief, for Bar Association of Montgomery County, Maryland, other appellee.

DIGGES, J., delivered the opinion of the Court.

In 1976 the Maryland General Assembly passed legislation, as have many other state legislatures, substantially altering the manner in which claims of medical malpractice by patients against physicians, hospitals, and other "health care providers" may be judicially resolved.[1] In general terms, the effect of this State's Health Care Malpractice Claims statute, Md. Code (1974, 1977 Cum. Supp.), §§ 3-2A01 to 3-2A09 of the Courts Article (the Act), is to require the submission of certain of such claims to an arbitration panel for initial ascertainment of liability and damages before resort may be had to a court of law for final determination. The plaintiffs in this declaratory judgment action asserted that the Act is constitutionally infirm as impermissibly vesting judicial power in a nonjudicial body in violation of separation of powers principles, as abridging the rights of access to the courts and of trial by jury, and as denying to malpractice claimants the equal protection of the laws. Our careful assessment of these assertions reveals that the statute is in each respect constitutionally sound.

The suit arose when James and Sheila Johnson, claiming that their minor daughter had died as a result of the negligence of unnamed physicians employed by The Johns Hopkins Hospital, and distressed by the fact that they were prevented by the 1976 enactment from immediately instituting a malpractice action in a court of law, sought a

---

1. For a delineation of the various types of medical malpractice reform legislation, both passed and proposed, as well as for citation to the various state statutes enacted, see Abraham, *Medical Malpractice Reform: A Preliminary Analysis,* 36 Md. L. Rev. 489 (1977). For a compilation of cases involving the validity and construction of such legislation, see Annot., 80 A.L.R.3d 583 (1977). *See also* U. S. Dep't of Health, Educ. & Welfare, Pub. No. (OS) 73-88, *Medical Malpractice: Report of the Secretary's Comm'n on Medical Malpractice* (1973).

declaratory judgment to the effect that the Act violated federal and state constitutional provisions and that they should therefore be permitted to file their law suit without first complying with the new statute. Originally named as defendants were Francis B. Burch, Attorney General of the State of Maryland, and Ronald Schreiber, Deputy Legislative Officer for the Governor and Acting Director of the Health Claims Arbitration Office created by the statute. The Johnsons amended their petition to include The Johns Hopkins Hospital as a party defendant, and the trial court permitted intervention as parties defendant by the Medical Mutual Liability Insurance Society of Maryland, a physician-controlled insurance company created by statute, and the Medical and Chirurgical Faculty of the State of Maryland, a voluntary professional organization of Maryland physicians; the Bar Association of Montgomery County was also permitted to intervene as a party plaintiff.[2]

With the forces thus arrayed for battle, trial was had in the Baltimore City Court during the period April 25 to May 6, 1977; on June 6 judgment was entered declaring the Act invalid, the court holding that the statute unconstitutionally vested judicial power in an administrative agency and that it imposed procedural and monetary impediments substantial enough to deny claimants reasonable access to the courts and the attendant right to trial by jury. The defendants noted a timely appeal, and the plaintiffs cross-appealed from the trial court's holding that the Act did not violate the equal protection clause of the United States Constitution or the corollary due process requirements of the Maryland Declaration of Rights. We granted certiorari prior to consideration of the matter by the Court of Special Appeals and now reverse the judgment entered in the Baltimore City Court.

We have already noted the general thrust of the Act — that medical malpractice claims be submitted to arbitration as a

2. Upon what theory the Medical Mutual Liability Insurance Society, the Medical and Chirurgical Faculty, and the Bar Association were permitted to intervene as parties, rather than simply being allowed to participate as amicus curiae, is not clear; however, since no one questions their status as parties we will not further consider the matter.

precondition to court action — and we now outline in greater detail the mode envisioned by the statute for the accomplishment of the arbitration process and any subsequent court litigation. All malpractice claims against health care providers [3] seeking damages of more than $5,000 are subject to the provisions of the Act, § 3-2A02 (a), and must be initially filed, as must the responses to them, with the Health Claims Arbitration Office, § 3-2A04 (a), created by the statute "as a unit in the Executive Department." § 3-2A03 (a). The office, acting through its director, see § 3-2A03 (a), refers all issues raised to a three-member arbitration panel, § 3-2A05 (a), chosen at random from lists of qualified persons prepared and maintained by the director, §§ 3-2A03 (c) & 3-2A04 (b); the panel for each claim is to be composed of an attorney, a health care provider, and a member of the general public.[4] §§ 3-2A03 (c) & 3-2A04 (d). The arbitration panel determines whether the health care provider is liable to the claimant and if so the extent of the damages, and incorporates in its award an assessment of costs, including arbitrators' fees, § 3-2A05 (d) & (e); if no party rejects the award, it becomes final and binding, is filed by the director with the appropriate circuit court, and when confirmed by that court constitutes a final judgment. § 3-2A05 (h).[5] Neither party, however, is in any way bound to accept the award; it may be rejected for any reason within

---

3. Section 3-2A01 (e) of the Act defines "health care provider" as "a hospital, a related institution as defined in Article 43, § 556 of the Code, a physician, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland."

4. If the claim falls within a recognized specialty, the director, if practicable, is to include persons in that specialty on the list of arbitrators from the health care provider category. § 3-2A04 (b).

The director is also responsible for having a copy of the claim served on the health care provider, § 3-2A04 (a); for delivering a list of fifteen potential arbitrators to the parties and selecting the first mutually agreeable persons after the parties have had an opportunity to strike two names in each category and to object for cause to any arbitrator, § 3-2A04 (b), (c) & (d); for serving the panel's award on the parties, § 3-2A05 (f); for filing the award in court if it is not rejected by any party, § 3-2A05 (h); and for determining by regulation the fees which may be charged by the arbitrators. § 3-2A03 (d).

5. If initiated in a timely manner, section 3-2A05 (g) allows a party to apply to the arbitration panel for modification or correction of the award in accordance with section 3-222 of the Courts Article, Md. Code (1974).

ninety days. § 3-2A06 (a). If a party desires to contest the decision of the panel, he must file an action in the appropriate court during the ninety-day period to nullify the award, § 3-2A06 (b) & (f),[6] and jury trial may be elected by either party. § 3-2A06 (b). Any contention that an award should be vacated on the ground of corruption, fraud, partiality or the like, *see* Md. Code (1974), § 3-224 (b) (1)-(4) of the Courts Article, is to be decided by the court prior to trial. § 3-2A06 (c). Unless the award is thus vacated, it is admissible as evidence at the trial and presumed to be correct, with the burden of proving the contrary falling on the party rejecting it, § 3-2A06 (d); should the award be vacated, "trial of the case shall proceed as if there had been no award." § 3-2A06 (c). In addition, attorneys' fees are subjected to the approval respectively of the arbitration panel and the court. § 3-2A07.

Before beginning our analysis of the several challenges to the statute, we refer briefly to the circumstances, as developed at trial, which spurred the passage of this legislation. The appellees sought to show that the malpractice insurance "crisis" sweeping the nation, *see* note one *supra,* had avoided the State of Maryland, and that the General Assembly had imposed a draconian solution to a minor problem; as they put it, surgery has been performed when the patient could have been cured with aspirin. It is clear that although the dominant insurer in Maryland received a dramatic rate increase in 1974, it nonetheless decided to cease writing medical malpractice insurance in this State when it was refused its request for an additional substantial increase later that year.[7] The General Assembly at its 1975 session responded to this withdrawal notice by creating, effective in June of that year, the Medical Mutual Liability Insurance Society of Maryland, *see* Md. Code (1957, 1972 Repl. Vol., 1977 Cum. Supp.), Art. 48A, §§ 548-556, an insurance company initially funded by a tax on Maryland physicians, and which

---

6. "[T]he procedures applicable to the [court] action including the form and necessary allegations in the initial pleading shall be governed by the Maryland Rules." § 3-2A06 (b).

7. For a case relating the circumstances surrounding the refusal of the dominant insurer to continue to write medical malpractice insurance, and noting particularly the rise in the cost of such insurance, see St. Paul Fire & Mar. v. Ins. Comm'r, 275 Md. 130, 133, 339 A. 2d 291, 293 (1975).

now insures ninety percent of the State's doctors; availability of coverage was thereby assured.[8] In July of that year, the presiding officers of both houses of the General Assembly jointly appointed a Medical Malpractice Insurance Study Committee, which in its subsequent report to the legislature indicated that the creation of Medical Mutual represented only temporary relief for the "myriad problems of medical malpractice insurance," and recommended legislation similar to the present Act.

At trial the appellees attempted to show that the appellant Medical and Chirurgical Faculty, upon the withdrawal of the dominant insurer, frustrated new carriers from entering the market and thus itself precipitated the crisis; the trial court, however, rejected this suggestion as not being factually supported by the evidence. A great deal of testimony was also adduced during the course of the trial respecting the cost of prosecuting malpractice claims and the effect on those costs of the newly-created arbitration proceedings, the trial court concluding that a claimant's costs would be substantially increased if the case were brought to court after arbitration, and reduced if the arbitration award were accepted.

With this background, and bearing in mind that before a statute may be declared unconstitutional "its repugnancy to the provisions or necessary implications of the Constitution should be manifest and free from all reasonable doubt," *Baltimore v. State,* 15 Md. 376, 475 (1860) (concurring opinion); *see Lucky Stores v. Bd. of Appeals,* 270 Md. 513, 526, 312 A. 2d 758, 765 (1973), we pause before addressing the particular constitutional issues to point out two basic tenets which are helpful to recall in an analysis of a statute of the character here presented. The first was well stated by Judge O'Donnell for this Court in *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 48-49, 300 A. 2d 367, 378 (1973):

> The wisdom or expediency of a law adopted in the exercise of the police power of the state is not subject to judicial review and such a statute will not be held

---

8. No one here disputes that malpractice insurance is now very desirable, if not essential, for the protection of both the members of the medical profession and their patients.

void if there are any considerations relating to the public welfare by which it can be supported. Such a statute is presumed to be valid and one attacking its validity has the burden of affirmatively and clearly establishing its invalidity; every intendment is in favor of the validity of the statute where there is a substantial relationship between its object and the means employed to attain that object. [Citations omitted.]

See also *Westchester West No. 2 v. Mont. Co.,* 276 Md. 448, 455, 348 A. 2d 856, 860 (1975). We can thus pass no judgment on disputed questions of social policy.

The second principle to be borne in mind is that, except as circumscribed by the documents themselves, neither the Federal Constitution nor that of our State forbids the creation of new rights or the abolition of old ones recognized by the common law. "The common law, like our Acts of Assembly, [is] subject to the control and modification of the Legislature, and may be abrogated or changed as the General Assembly may think most conducive to the general welfare . . . ." *The State v. Buchanan et al.,* 5 H. & J. 317, 366 (1821) (Chase, C. J., concurring); *see State ex rel. Sonner v. Shearin,* 272 Md. 502, 510, 325 A. 2d 573, 578 (1974); *Heath v. State,* 198 Md. 455, 464, 85 A. 2d 43, 47 (1951).

A person has no property, no vested interest, in any rule of the common law. . . . Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. [*Munn v. Illinois,* 94 U. S. (4 Otto) 113, 134, 24 L. Ed. 77 (1877).]

*See Silver v. Silver,* 280 U. S. 117, 122, 50 S. Ct. 57, 74 L. Ed. 221 (1929). Clearly, then, there can be no question but that the legislature has the power to impose, within constitutional limits, rational conditions upon the right to turn to the courts for redress of grievances. Neither the fourteenth amendment nor our Constitution "prevent[s the General Assembly] from

prescribing a reasonable and appropriate condition precedent to the bringing of a suit of a specified kind or class so long as the basis of distinction is real, and the condition imposed has reasonable relation to a legitimate object." *Jones v. Union Guano Co.,* 264 U. S. 171, 181, 44 S. Ct. 280, 68 L. Ed. 623 (1924) (upholding state statute providing that no suit for damages to crops resulting from use of fertilizer may be brought except after chemical analysis showing deficiency of ingredients).[9] Of course the conditions imposed upon the bringing of a suit may not independently violate any rights secured by the Constitution. With this in mind, we turn to an analysis of the constitutional objections lodged by the appellees against the Act.

## I.

We address first the appellees' contention, and the trial judge's conclusion, that the Act vests judicial power in an administrative agency contrary to the mandates of the Maryland Constitution, which provides that the judicial power be vested in enumerated courts, Md. Const., Art. IV, § 1, that the powers of the three departments of government be "forever separate and distinct," Maryland Declaration of Rights, Art. 8, and that no person exercising the functions of one branch may discharge the duties of another. *Id.* We think, to the contrary, that this statute, which in essence requires that malpractice disputes be submitted to nonbinding

---

9. Typical examples of such conditions placed upon common law causes of action are statutes of limitation, payment of reasonable cost deposits, and requirements that newspapers be given the right to retract before an action for libel may be filed. Carter v. Sparkman, 335 So. 2d 802, 805 (Fla. 1976), *cert. denied,* 429 U.S.1041,97 S. Ct. 740 (1977); *see* Md. Code (1974, 1977 Cum. Supp.), § 7-201 of the Courts Article (no case at law or in equity may be docketed without payment of required fee). *See also* 1 Am.Jur.2d *Actions* § 80, at 609 (1962). The Maryland legislature has also permitted causes of action not recognized at common law and placed preconditions upon the institution of suit under them. *See* Md. Code (1957, 1972 Repl. Vol., 1977 Cum. Supp.), Art. 57, § 18 (imposing as condition precedent to action against municipal corporation requirement that notice be given to it by claimant within 180 days after the injury or damage is sustained) (predecessor statute interpreted in Cotham and Maldonado v. Board, 260 Md. 556, 563-65, 273 A. 2d 115, 119-20 (1971)); Md. Code (1974, 1977 Cum. Supp.), § 3-904 of the Courts Article (condition precedent to suit for wrongful death that action be filed within three years) (predecessor statute interpreted in State v. Parks, 148 Md. 477, 482, 129 A. 793, 795 (1925)).

arbitration as a condition precedent to the institution of a court action, does not in any fashion impermissibly transgress the separation of powers doctrine. To conclude otherwise would be to embrace "the erroneous notion that all adjudication is judicial," *Mulhearn v. Federal Shipbuilding & Dry Dock Co.,* 2 N. J. 356, 66 A. 2d 726, 730 (1949), and to overlook two crucial facts present here relevant to the exercise of judicial power: that the parties are in no way bound by the award of the arbitration panel and that the panel itself cannot enforce its award.

Preliminarily, we note that it is undeniable that the mere performance by a nonjudicial body of a function that would in another context be considered purely judicial — *e.g.,* the determination of facts and the application of legal principles to those facts — cannot alone suffice to support a conclusion that the separation of powers principle has been violated. Were that not so, of course, no administrative agency performing an adjudicatory function could survive constitutional muster. As we observed in *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 222, 334 A. 2d 514, 522 (1975), while administrative agencies perform activities which are legislative in nature, they also are frequently "called upon to make factual determinations and thus adjudicate"; this dual role has long been accepted as constitutionally permissible. We have pointed out before, and we reemphasize here, that adjudicatory determinations by such agencies are not judgments or decrees, *see Dal Maso v. County Commrs.,* 182 Md. 200, 205, 34 A. 2d 464, 466 (1943); that such an agency ascertains questions of fact and applies the law to those facts in a particular case does not alone vest it with judicial power in the constitutional sense. *See County Council v. Investors Funding,* 270 Md. 403, 429-32, 312 A. 2d 225, 239-41 (1973); *Heaps v. Cobb,* 185 Md. 372, 378-79, 45 A. 2d 73, 76 (1945); *Dal Maso v. County Commrs., supra* at 205 [466]; *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 284, 101 A. 710, 716 (1917). We have denominated this function of an administrative agency, exercised in the performance of permissibly-delegated duties, quasi-judicial. *Dep't of Nat. Res. v. Linchester, supra* at 222, 223 [522].

While the appellees protest that the statute vests judicial power in an administrative agency, we observe preliminarily that it is clear that such a formulation of the Act's consequences is inaccurate, for the simple reason that the entity assertedly performing the judicial function — the arbitration panel, and not the Health Claims Arbitration Office — is not an administrative agency in the traditional sense. As earlier described, the malpractice claims statute creates a "unit in the Executive Department" denominated the Health Claims Arbitration Office; the primary function of that office, in addition to providing a mechanism for the service of claims and various other papers on the affected parties and for the filing in court of panel decisions that have not been rejected, is to assist the parties in the selection of a panel of arbitrators in order that the precondition to court litigation imposed by the Act may be met. We summarize our earlier description of that selection procedure: The director of the Arbitration Office delivers to the parties a list of fifteen potential arbitrators (five from each of the three categories) chosen at random from lists which the director prepares and maintains, §§ 3-2A04 (b) & 3-2A03 (c); the latter lists must include those persons on the American Arbitration Association list of arbitrators who are willing to serve. § 3-2A03 (c). The parties have an opportunity to object for cause to the inclusion of any arbitrator on the list of fifteen; [10] the claimant and the health care provider may also each peremptorily strike two names in each category, § 3-2A04 (c), and the director then selects, from the lists returned to him, the first mutually agreeable person in each category. § 3-2A04 (d). It only remains to add that the parties may, if they choose, agree in writing upon a single arbitrator and so advise the director. § 3-2A04 (e). The arbitration panels so selected are not in any respect a part of the Health Claims Arbitration Office. The office's director refers the claim to the panel selected — or to a single arbitrator agreed upon by

---

10. If the director determines that there is a reasonable basis for a party's objection to a given arbitrator, he replaces the name of that arbitrator with another. § 3-2A04 (c). The director is also responsible for assuring himself, before the randomly-selected names are delivered to the parties, that no arbitrator on the list has a personal or economic relationship with a party which could form a basis for partiality on his part. § 3-2A04 (b).

the parties — and the arbitration panel, when it has made an award, delivers it in writing to the director, § 3-2A05 (a) & (f), but there is no other nexus between the panel and the arbitration office. The arbitrators are not a part of the office's staff; they are paid by the parties themselves, and not by any governmental unit; they serve purely on a voluntary basis; and they meet to consider a single claim and then disband. They are thus in no sense a typical organ of government.

Since the arbitrators are obviously not a part of the executive unit created by the Act, it becomes plain that the unit so created — the Health Claims Arbitration Office — exercises no judicial function whatever.[11] That all this is so is not, as we shall see, the end of the matter. From it one must conclude, however, that it is analytically inaccurate to frame the inquiry in terms of whether the statute has vested judicial power in an administrative agency, thus violating the prohibition against the exercise by one entity of the functions of two departments of government. Properly posed, the question is not one implicating administrative law principles, but is simply whether judicial power has been vested in an entity which is not a court, contrary to the dictates of Article IV, section 1.

As we have already dismissed the notion that judicial power in the constitutional sense is necessarily exercised whenever facts are determined and legal principles are applied to the facts found, we must ascertain what qualities imbue such determinations with judicial power. While we have not, until today, explicitly stated the proposition, we agree with those courts which have said that the essence of judicial power is the final authority to render and enforce a judgment, see, e.g., Cedar Rapids, Etc. v. Cedar Rapids Commun. Sch., 222 N.W.2d 391, 396 (Iowa 1974); Underwood v. McDuffee, 15 Mich. 361, 368 (1867); Breimhorst v. Beckman, 227 Minn. 409, 35 N.W.2d 719, 733 (1949), and we think that conclusion is implicit from our own case law. See County Council v. Investors Funding, 270 Md. 403, 437, 312 A. 2d 225, 243 (1973)

---

11. It is thus unnecessary in this case that we pause to consider the extent to which the office and its activities are subject to administrative law principles.

(Commission's determinations not final, but always open to judicial review; it makes no " 'binding judgments' of the kind that denote strictly judicial power"; it has no power to force compliance with its orders); *Dal Maso v. County Commrs.,* 182 Md. 200, 205, 34 A. 2d 464, 466 (1943) (decisions of administrative agencies not judgments or decrees). As we said in *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265, 282, 101 A. 710, 715 (1917), and have repeated many times, *see, e.g., Reyes v. Prince George's County,* 281 Md. 279, 297, 380 A. 2d 12, 22 (1977); *Shell Oil Co. v. Supervisor,* 276 Md. 36, 45-46, 343 A. 2d 521, 526 (1975), "It is not enough to make a function judicial that it requires discretion, deliberation, thought, and judgment. It must be the exercise of discretion and judgment within the subdivision of the sovereign power which belongs to the judiciary . . . ." It is elementary that an entity does not exercise the sovereign power of the State constitutionally assigned to the judiciary if its decision is in *no* sense final, binding or enforceable; no power of any meaningful kind — to say nothing of *sovereign* power — inheres in a decision which, as in the Act before us, need not be accepted and which, if accepted, cannot be enforced by the entity which made it.

Here the statute merely requires that malpractice claims be submitted to nonbinding arbitration before suit may be filed.[12] The decision of the panel is not — or need not be — in any sense a final determination of the controversy. Either party may reject the panel's determination, for any reason or no reason, and proceed, as he could have before the statute was enacted, to have the matter determined in an appropriate Article IV court of law. Even if the parties accept the decision of the arbitrators, the panel which made it cannot enforce it.[13]

---

12. Arbitration is simply a method of dispute resolution alternative to the invocation of the judicial process, and the idea that persons could, by agreement, submit a dispute to arbitrators for resolution has long been accepted in Maryland — it is in fact "familiar to the law since its earliest history," Shriver v. The State of Maryland, 9 G. & J. 1, 11 (1837), and "favored for the settlement of disputes." Parr Construction Co. v. Pomer, 217 Md. 539, 543, 144 A. 2d 69, 72 (1958). We cannot conceive of any theory by which such a process, when it is imposed by statute as a precondition to court action, can by that fact alone be transposed into a judicial function.

13. That the award of the arbitration panel "shall" be confirmed when filed with the circuit court, if it is accepted by the parties, and upon confirmation becomes a final judgment, *see* §§ 3-2A05 (h) & 3-2A06 (a), in no way alters

We think it evident that the panels exercise no portion of the judicial power of this State in the constitutional sense.[14]

Authority in other jurisdictions is in accord with the proposition that a statutory requirement that disputes be submitted to a nonjudicial entity for determination prior to court action is not an unconstitutional delegation of judicial power.[15] *Eastin v. Broomfield,* 116 Ariz. 576, 570 P. 2d 744,

---

our conclusion that the panel performs no function that is judicial in the constitutional sense. Precisely similar activity occurs when judgment is entered pursuant to a settlement agreed to by the parties. It is the agreement — here, the failure to reject the award — which allows the entry of judgment. As the highest court of Pennsylvania has said, "[A]n award made pursuant to compulsory arbitration is not itself a judgment," Weber v. Lynch, 473 Pa. 599, 375 A. 2d 1278, 1283 (1977); that court noted further that "[t]he purpose of an appeal is to prevent judgment. When an appeal is taken the award becomes an undetermined cause which must be tried de novo and prosecuted to judgment, discontinuance, or non pros." *Id.* at 1283 n. 7 (quoting Lanigan v. Lewis, 210 Pa. Super. 273, 277, 232 A. 2d 50, 52-53 (1967)).

While it is true that parties to specific kinds of civil litigation in certain courts of this State may similarly reject that court's determination and proceed to a de novo appeal, *see* Md. Code (1974 & 1977 Cum. Supp.), §§ 12-401 (c) & 12-502 (a) of the Courts Article, a fundamental distinction lies in the fact that, if de novo proceedings are not elected, the court — unlike an arbitration panel — may enforce its own judgment.

14. The function performed by the arbitration panels here, in respect to its nature, is not unlike that performed by masters in chancery. (That office once existed under the inherent jurisdiction of the chancery court, and masters now may also be appointed pursuant to the constitutional provision (Art. IV, § 9) allowing judges to appoint officers for their respective courts. E. Miller, *Equity Procedure* § 555, at 653 (1897).) A master "hears evidence and then reports his findings of fact and his recommendations to the chancellor," Matter of Anderson, 272 Md. 85, 106, 321 A. 2d 516, 527 (1974), *cert. denied,* 421 U. S. 1000 (1975), and we have said that while a master's report is only advisory, full consideration should be given to it and findings of fact left undisturbed unless clearly erroneous. Bar Ass'n v. Marshall, 269 Md. 510, 516, 307 A. 2d 677, 680 (1973). Just as in the case of a master, "no one would contend that the recommendation made by [him] after a hearing . . . constitutes a final determination of the matters there in dispute," Matter of Anderson, *supra* at 105 [527], so it is here — it is open to either party to "reject an award for any reason." § 3-2A06 (a). And just as a master "is a ministerial officer, and not a judicial officer," and "under the Maryland Constitution a master is entrusted *with no part of the judicial power of this State,*" Matter of Anderson, *supra* at 106 [527] (emphasis added), it cannot be otherwise here.

15. The appellees make much of this State's unique position as compared to the federal government and most of our sister states with regard to its constitutional provisions concerning the separation of powers, arguing that because most state constitutions, unlike Maryland's, do not expressly confine judicial power to enumerated courts, nor expressly forbid persons exercising the functions of one branch to exercise those of another, decisions from other jurisdictions are neither applicable nor persuasive. For this proposition they chiefly cite Judge Barnes' dissenting opinion in County Council v. Investors Funding, 270 Md. 403, 447-51, 312 A. 2d 225, 249-51 (1973). Since the

750 (1977) (statutory requirement that malpractice claims be submitted to medical liability review panel prior to court action); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657, 666-67 (1977) (same); *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434, 448-49 (1978) (same); *Thornbrough v. Williams,* 225 Ark. 709, 284 S.W.2d 641, 644 (1955) (upholding statute allowing employer or employee to require dispute over wages earned to be decided by Commissioner of Labor, with either party having right to refuse to accept the finding and proceed at law); [16] *Collier & Wallis v. Astor,* 9 Cal. 2d 202, 70 P. 2d 171, 173-74 (1937) (upholding statute empowering labor commissioner to determine disputes between employment agency and applicants, with right to trial de novo in superior court). *But see In re Opinion of the Justices,* 87 N. H. 492, 179 A. 344, 357 (1935). Often cases involving the constitutionality of arbitration statutes do not even mention the question of separation of powers. *See, e.g., Application of Smith,* 381 Pa. 223, 112 A. 2d 625 (upholding statute permitting courts to adopt rules providing for compulsory arbitration of civil suits involving $1,000 or less with de novo appeal), *appeal dismissed sub nom. Smith v. Wissler,* 350 U. S. 858 (1955). The general rule with regard to compulsory arbitration — arbitration to which the consent of at least one of the parties is enforced by statutory provisions, *see Wood v. Seattle,* 23

separation of powers principle is "expressly or impliedly recognized in the basic law of every state in this nation," Dep't of Nat. Res. v. Linchester, 274 Md. 211, 218, 334 A. 2d 514, 520 (1975), we are not convinced that the mere absence of express provisions similar to ours is of any substantial significance; thus decisions of our sister states on the issue are relevant. However, we need not here belabor the question since it is obvious that we have repeatedly upheld, as have all other states, "the delegation to administrative agencies of some of the types of adjudications historically performed by courts . . . ," Shell Oil Co. v. Supervisor, 276 Md. 36, 47, 343 A. 2d 521, 527 (1975), and that in so doing we have cited principles similar to those we apply here in finding no violation of the separation of powers. *See* County Council v. Investors Funding, *supra* at 437 [243] (non-finality of decisions; lack of power to force compliance).

16. It should be noted that Article 4 of the Arkansas Constitution specifically prohibited each department of government from exercising any power belonging to either of the others except as expressly permitted in the constitution, and Article 7 of that document vested judicial power in enumerated courts and justices of the peace, with jurisdiction to hear and determine private contractual rights vested exclusively in certain of those courts. *See* Thornbrough v. Williams, 225 Ark. 709, 284 S.W.2d 641, 643, 646 (1955).

Wash. 1, 62 P. 135, 143 (1900) — appears to be that coercive statutes which close the courts to litigants by compelling resort to arbitrators for final determination of rights are invalid, whereas statutes which aid the courts by providing for arbitration but reserving a right to appeal to a court are generally valid. 5 Am.Jur.2d *Arbitration and Award* § 9, at 526 (1962). *See generally* Annot., 55 A.L.R.2d 432 (1957). That, of course, is entirely in accord with our conclusions here.

Finally, we would be remiss if we did not mention that the Supreme Court of Illinois has recently concluded, contrary to our determination in this case, that legislation requiring submission of malpractice claims to a medical review panel similar to those created here, but with a circuit judge a member of each panel, prior to trial of the case, unconstitutionally vested judicial functions in nonjudicial personnel. *Wright v. Central Du Page Hospital Association,* 63 Ill. 2d 313, 347 N.E.2d 736 (1976). The court there, however, said no more than that the application of principles of law is inherently a judicial function, and that the nonjudicial members of the panel were empowered to exercise it. 347 N.E.2d at 739-40. We find that rationale, in view of all the considerations we have discussed above, singularly unpersuasive.

## II.

Having concluded that Article IV of the Maryland Constitution and Article 8 of its Declaration of Rights do not prevent the General Assembly from requiring as a condition precedent to a civil suit that the litigants attempt to resolve their dispute by submitting it to an arbitral panel before presenting the controversy to a court for resolution, we proceed to analyze the contention that such a requirement nonetheless violates other rights secured by our State and the federal constitutions. The trial court found that the Act imposes procedural and monetary impediments — substantial expense in producing expert witnesses before the arbitrators, significant lengthening of the time necessary to achieve a final judicial resolution of the claim, and the necessity of overcoming the presumption of correctness which attaches to the arbitral decision at the subsequent trial — calculated to

inhibit a claimant from pursuing court action in the face of an adverse arbitral award, and that these impediments "deny a claimant reasonable access to the courts and his attendant constitutional right to trial by jury." Two of the appellees, the Johnsons, urge that it is the presumption of correctness which effectively vitiates the right to trial by jury secured by Article XV, section 6 of the Maryland Constitution, and that for many potential litigants the financial burden and delay associated with the arbitration process effectively bar the access to the courts which is guaranteed by Article 19 of the Declaration of Rights. See also Md. Decl. of Rts., Arts. 5 & 23. The remaining appellee, the Bar Association, suggests that the Act deprives a claimant of trial by jury and of access to the courts by virtue of a number of "infringements" which, though if taken singly may not amount to constitutional transgressions, when considered as a composite whole do just that: admissibility of the arbitration panel's decision together with the presumption that it is correct; failure to allow the claimant to attack the panel decision before the jury on grounds that it was procured by corruption, fraud, undue means, or partiality; failure to allow voir dire of the arbitration panel; costs and delay imposed before access to the courts can be gained; and control of attorney fees. We perceive, however, no deprivation of either trial by jury or access to the courts on any of these grounds, considered either individually or collectively. The whole here is no more unconstitutional than its individual parts; we therefore treat the challenges to the statute on this aspect of the case seriatim.

Maryland's Constitution, Article XV, section 6, which provides that "[t]he right of trial by Jury of all issues of fact in civil proceedings . . . shall be inviolably preserved," like the seventh amendment to the Constitution of the United States, requires that "enjoyment of the right . . . be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with." *In re Peterson,* 253 U. S. 300, 310, 40 S. Ct. 543, 64 L. Ed. 919 (1920) (Brandeis, J.). The appellees strenuously urge that, as to the second of these commands, the admissibility of the panel's award together

with its presumption of correctness "virtually deprive the jury of its constitutional function." To buttress this assertion, the appellees point to only two cases, *Comiskey v. Arlen,* 45 U.S.L.W. 2019 (N.Y. Sup. Ct. Queens County July 2, 1976); and *Simon v. St. Elizabeth Medical Center,* 355 N.E.2d 903, 907-08 (C.P. Ohio 1976), both involving malpractice statutes permitting the admission of the decisions of screening or arbitral panels at a subsequent trial, both decided by trial courts, both of which cite no authority to support their conclusions, and one of which has been overruled on appeal. *See Comiskey v. Arlen,* 55 App.Div.2d 304, 390 N.Y.S.2d 122, 125 (1976) (thrust of decision below was unwarranted assumption that "no jury could evaluate a medical malpractice panel's recommendation with objectivity, or follow a trial court's instructions regarding the weight to be given it"), *aff'd on other grounds,* 43 N.Y.2d 696, 372 N.E.2d 34, 401 N.Y.S.2d 200 (1977). The law is clearly contrary to the appellees' contention. For recent cases of our sister states holding that statutory provisions allowing the admissibility into evidence of the findings of medical malpractice review panels are in essence simply rules of evidence and do not violate the right to jury trial, see *Eastin v. Broomfield,* 116 Ariz. 576, 570 P. 2d 744, 748-49 (1977); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657, 665-66 (1977); *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434, 450-53 (1978).[17]

17. Noting that admission of the award is intended to deter resort to retrial, and that such deterrence imposes a burden on the right to jury trial, one commentator has urged courts to consider, in determining whether the burden is permissible, the function of admitting the award:

> Admissibility is intended to discourage either party from failing to present a complete case at arbitration in hopes of vindication at trial. By encouraging thorough presentation of the case at arbitration the provision promotes final resolution of the claim in one stage (arbitration) rather than two (arbitration and trial). Resolution in a single stage would permit the parties to realize the cost savings attributable to arbitration. Such savings and the presumably fair results in most cases will cause most parties to conclude that a jury trial is not desirable. Only in the relatively rare case where there remains hope for a different verdict at trial will the admissibility of the award affect the jury's role, and in those cases the lawyer may be able to neutralize the effect of the award. Admissibility of the award thus plays an important part in making the entire plan work and results in only a relatively insignificant or possibly nonexistent intrusion on the domain of the jury. [Note, *Medical Malpractice*

We begin by pointing out exactly what the statute provides in this regard: that the award is admissible as evidence, that it "shall be presumed to'be correct, and [that] the burden is on the party rejecting it to prove that it is not correct." § 3-2A06 (d). The effect of this provision is precisely the same as occurs under the Workmen's Compensation Act, which provides that the Commission's decision is "prima facie correct and [that] the burden of proof shall be upon the party attacking the same." Md. Code (1957, 1964 Repl. Vol.), Art. 101, § 56 (c). We long ago said that the latter provision means that the Commission's solution of the conflict *is presumed to be correct,* and the burden of proof is upon the party attacking it to show that it was erroneous." *Moore v. Clarke,* 171 Md. 39, 45, 187 A. 887, 890 (1936) (emphasis added). "[I]t simply puts the burden of proof upon the party taking the appeal, whether he be plaintiff or defendant. In other words *it establishes no new rule when the plaintiff happens to be the party appealing,* as the burden was always upon the plaintiff to prove his case." *Stewart & Co. v. Howell,* 136 Md. 423, 434, 110 A. 899, 902 (1920) (emphasis added).[18] We have further explained that the provision "means nothing more than that, if the mind of the trier of facts is in equal balance on the evidence in the record, the finding of the Commission should be affirmed." *Blake Construction v. Wells,* 245 Md. 282, 286, 225 A. 2d 857, 860 (1967). When the malpractice

---

*Arbitration: A Comparative Analysis,* 62 Va. L. Rev. 1285, 1303-04 n. 110 (1976).]

That same commentator has suggested that the Maryland statute, by requiring the challenger to prove the award incorrect, may deprive him of an opportunity for a jury determination on the issues of liability and damages. *Id.* at 1305. No explanation of why this might be so is offered, however. The commentators generally agree that admissibility of a panel award does not deny the right to jury trial. *See* Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex. L. Rev. 759, 793 (1977) ("merely another piece of evidence for the jury to consider"); Lenore, *Mandatory Medical Malpractice Mediation Panels — A Constitutional Examination,* 44 Ins. Counsel J. 416, 422 (1977) (same).

18. Except in the comparatively rare situation in medical malpractice cases where contributory negligence or assumption of risk is an issue, the only change in the burden of proof at trial will thus occur when the health care provider appeals an award against him by the arbitration panel — there, essentially, the defendant must prove that the award finding him liable and assessing damages was not correct — *i.e.,* that he was not negligent. While we think it clear that the legislature may alter the burden of proof, the appellees as plaintiffs below would not in any event be able to demonstrate prejudice in this regard. *See* McBriety v. Baltimore City, 219 Md. 223, 233, 148 A. 2d 408, 415 (1959).

claimant is the party appealing, the statutory provision thus has no effect whatever on his burden of proof in respect to primary negligence.

That the legislature may, in any event, pass rules affecting the burden of proof without infringing the right to jury trial is not to be doubted, as is evident from both our own case law and decisions of the Supreme Court of the United States. In *Bonaparte v. M. & C. C. of Balto.,* 131 Md. 80, 86, 101 A. 594, 596 (1917), we assessed the validity of a provision of a city charter making a monetary award to a property owner by the Commissioners for Opening Streets prima facie evidence at a subsequent condemnation trial of the correctness of the amount of damages awarded, and placing the burden of proof on the party asserting that the amount should be more or less than that awarded by the Commissioners. We rejected the suggestion that this provision violated section 40 of Article III of the Maryland Constitution requiring the payment of just compensation, if not agreed upon by the parties, to be awarded by a jury:

> The appellant's right to a jury trial, upon the question as to the compensation to be awarded him for the property condemned . . . is not prejudiced by the [charter provision]. The purpose of [that provision] is simply to attach the presumption of correctness to the report of the Commissioners, as against an appeal by either the city or the property owner. This regulation is entirely consistent with the right afforded the owner to prove, and with the duty imposed upon the jury to determine, the true amount of the just compensation to be awarded. [*Id.*]

And in *Meeker v. Lehigh Valley R. Co.,* 236 U. S. 412, 430, 35 S. Ct. 328, 59 L. Ed. 644 (1915), the Supreme Court concluded that a statutory provision making the "findings and order of the [Interstate Commerce] Commission . . . prima facie evidence of the facts therein stated" in a subsequent civil suit to enforce payment as directed in the Commission's order did not infringe the right of trial by jury. The Court said:

> This provision only establishes a rebuttable presumption. It cuts off no defense, interposes no

obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most, therefore, it is merely a rule of evidence. It does not abridge the right of trial by jury, or take away any of its incidents. Nor does it in anywise work a denial of due process of law.... An instructive case upon the subject is Holmes v. Hunt, 122 Mass. 505, 23 Am. Rep. 381 [(1877)], where, in an elaborate opinion by Chief Justice Gray, a statute making the report of an auditor prima facie evidence at the trial before a jury was held to be a legitimate exercise of legislative power over rules of evidence, and in nowise inconsistent with the constitutional right of trial by jury. [*Id.*]

*See In re Peterson,* 253 U. S. 300, 309-11, 40 S. Ct. 543, 64 L. Ed. 919 (1920) (seventh amendment does not prohibit introduction of new rules of evidence, and admission of auditor's report as prima facie evidence does not modify right of jury trial; an order of a court, "like a statute, is not unconstitutional because it endows an official act or finding with a presumption of regularity or of verity"). *See also Montchester v. Honga River,* 257 Md. 79, 262 A. 2d 312 (1970).

Despite what the Bar Association concedes to be "substantial authority" for the proposition that no constitutional infirmity ordinarily inheres in according a presumption of correctness to findings introduced at a later de novo trial, it nonetheless insists these authorities are unpersuasive as to the case at bar, asserting that here no "real" de novo trial is permitted.[19] Its position is apparently

---

19. The Bar Association also suggests that many of the cases supporting the proposition that a presumption of correctness in subsequent proceedings is permissible — workmen's compensation and administrative law cases — are inapposite since they involve situations in which the legislature would not have been required to provide a jury trial in *any* event. And indeed our predecessors in Branch v. Indemnity Ins. Co., 156 Md. 482, 489, 144 A. 696, 698 (1929), said: "Unless we were disposed to disregard the trend of our own decisions, and those of other courts in analogous cases, we could not conclude that a provision for jury trial on issues of fact is essential to the validity of the Workmen's Compensation Act of Maryland." However, the appellees ignore the fact that the federal cases cited are precisely on point since

[the Seventh] Amendment [to the Federal Constitution] requires trial by jury in [federally-created] actions unheard of at common

premised on the fact that the panel's award may not be attacked before the jury on the basis that (1) it was procured by fraud, corruption, or other undue means, (2) there was partiality, corruption, or misconduct on the part of an arbitrator, (3) the arbitrators exceeded their powers, or (4) the arbitrators conducted the hearing in such a manner as to prejudice substantially the rights of a party. Instead, these bases for rendering the award inadmissible in evidence are presented by preliminary motion and decided by the trial judge. *See* § 3-2A06 (c) & (d). How the fact that the trial judge determines the admissibility into evidence of the award deprives the claimant of a de novo trial of his malpractice claim eludes us completely. For an analogous situation where the Court determined in a land boundary dispute whether a commission's earlier boundary determination conducted pursuant to statute was properly made, so as to permit consideration by the jury in a subsequent judicial proceeding, see *Montchester v. Honga River, supra* at 85-87 [315-16]. Juries do not normally determine whether evidence is admissible, and we know of no reason why they should do so here. Nowhere does the Act preclude the parties in the trial of the case from presenting whatever evidence and making whatever arguments on the merits of the claim they might have made had there been no pretrial arbitration. That the jury does not consider whether the panel finding was infected with fraud, partiality, or the like has no relevance whatever to whether the parties receive that to which they are entitled — a de novo jury trial of the malpractice claim.

The appellees next assert that claimants are denied due process by the failure of the statute to provide an opportunity to conduct a voir dire examination of prospective members of the arbitration panel, so as to assure their freedom from bias and partiality. No authority is cited to support this proposition and we know of none; in fact, voir dire examination is not provided for in connection with most, if not all, panels, boards, commissions and the like. The Act requires the director of the

---

law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty. [Pernell v. Southall Realty, 416 U. S. 363, 375, 94 S. Ct. 1723, 40 L.Ed.2d 198 (1974).]

Health Claims Arbitration Office, who is responsible for preparation of a list of qualified persons willing to serve as arbitrators, § 3-2A03 (c), to assure himself that persons on the randomly chosen list delivered to the parties have no personal or economic relationship with either party, § 3-2A04 (b); it allows a party to object, and state reasons for doing so, to the inclusion of any arbitrator, and if the director finds there is a reasonable basis for the objection it requires him to replace the name of that arbitrator with another, § 3-2A04 (c); it allows a party to strike, without reason, two of the five potential arbitrators in each category (physicians, attorneys, and general public), § 3-2A04 (c); see § 3-2A04 (b); it requires the director to include a biographical statement for each of the potential arbitrators on the list delivered to the parties, § 3-2A04 (b); and finally, it permits the award to be vacated by the trial judge on the ground, among others, of "evident partiality by an arbitrator," in which event the case is tried as if there had been no award. § 3-2A06 (c); see Md. Code (1974), § 3-224 (b) (2) of the Courts Article. In addition, as we have already pointed out, a party is at liberty to reject the arbitration award for any reason and have the claim tried by a jury. We perceive no denial of due process. *See State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434, 446 (1978).

With this conclusion of the matters bearing on the question whether the statute violates the right to jury trial by interfering with the jury's determination of issues of fact, we come to what may be viewed as the determinative question on this branch of the case — whether the additional expense and delay, which are inevitable in every case in which court proceedings are elected after the arbitral decision, unconstitutionally deny malpractice claimants access to the courts as guaranteed by Article 19 of our Declaration of Rights [20] and thus the right to jury trial which accompanies resort to the judicial process in this type of civil case. *See* Md. Const., Art. XV, § 6. One commentator has suggested that

**20.** Article 19 provides: "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

this is the most serious constitutional difficulty posed by screening panels: that requiring a plaintiff "to proceed through an expensive and prolonged screening process prior to an actual judicial hearing effectively denies him the right of access to the courts guaranteed by many state constitutions." Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex. L. Rev. 759, 795-96 (1977). The few appellate courts which have considered the question in terms of expense have concluded that reasonable restrictions on the right of access may be prescribed by law, and that the exercise of the police power for the benefit of public health by an effort to reduce the cost of malpractice insurance, and ultimately medical expenses, is constitutional. *Carter v. Sparkman,* 335 So. 2d 802, 805-06 (Fla. 1976), *cert. denied,* 429 U. S. 1041, 97 S. Ct. 740 (1977); *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434, 444 (1978). In reaching this conclusion, the Supreme Court of Wisconsin observed: "States are under no constitutional obligation to neutralize the economic disparities which inevitably make resort to the courts different for some plaintiffs than. others." *Id.* A concurring opinion in *Carter,* noting that it was troublesome that malpractice plaintiffs may be put to the expense of two full trials on their claims and that the inequity was harsh for the category of claimants with limited resources, concluded that the statute could not be invalidated on that basis, since "[a] disparity of resources has always been an imbalance in litigation which the courts are relatively powerless to adjust." 335 So. 2d at 807-08. *See Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657, 663-64 (1977) (requirement of submission to medical review panel in no way precludes access to the courts for a final determination).[21]

We find ourselves bound to agree with the assessment made by the *Wilkie* court and by the concurring justice in *Carter.* The "law of the land" in Article 19 is the same due process of law required by the fourteenth amendment, *Matter*

---

21. For a procedure not unlike that provided in the Act, see Md. Code (1977), §§ 8-326 to 8-329 of the Transportation Article (establishing property review boards to fix value of land being condemned for highway purposes, with de novo court determination if any party is dissatisfied with the award).

*of Easton, Incompetent,* 214 Md. 176, 187, 133 A. 2d 441, 447 (1957), and we simply cannot conclude that the additional expense and delay mandated by this malpractice claims statute is so unreasonable in relation to its legitimate goal that it contravenes due process. When we recall that there is no vested interest in any rule of the common law, *Munn v. Illinois,* 94 U. S. (4 Otto) 113, 134, 24 L. Ed. 77 (1877), so that the common law "may be abrogated or changed as the General Assembly may think most conducive to the general welfare," *The State v. Buchanan et al.,* 5 H. & J. 317, 366 (1821) (concurring opinion), it becomes apparent that there is here no denial of the due process right of access to the courts by the addition of a mode of procedure which merely causes some delay and increases the expense for a litigant who takes his claim to court, since there is no deprivation of any vested property right. *See, e.g., Thompson v. Mazo,* 245 A. 2d 122, 124 (D.C. 1968) (bond or undertaking as condition precedent to asserting a right may place heavier, and sometimes impossible, burden on one of limited means, but such burdens are valid and reasonable when required to protect rights of public); *Montgomery v. Daniels,* 38 N.Y.2d 41, 378 N.Y.S.2d 1, 17-18, 340 N.E.2d 444, 456 (1975) ("no fault" law denying right to seek recovery for some injuries does not deny federal constitutional right of access to courts, since access for resolution of rights not subject to special constitutional protection may be denied if rational basis therefor); *Singer v. Sheppard,* 464 Pa. 387, 346 A. 2d 897, 902-04 (1975) ("no fault" law eliminating tort remedy for certain accident victims does not deny access to courts as guaranteed by state constitution); *Behrns v. Burke,* S. D., 229 N.W.2d 86, 88 (1975) (guest statute does not deny access to courts since injuries suffered by guest are not recognized as a wrong for which the law affords a remedy). It is thus clear that since the restriction imposed by the Act is reasonable [22] — as will

22. Professor Redish concludes, and we tend to agree, that despite the Florida court's warning that a claimant's prelitigation burden "reaches the outer limits of constitutional tolerance," Carter v. Sparkman, 335 So. 2d 802, 806 (Fla. 1976),

> courts should recognize that the preparation prior to screening panel review in most cases functions merely as an accelerated form of discovery for the actual trial. Certainly a state may provide for

be even more apparent from our later discussion of reasonableness in the context of the equal protection challenge to the statute — the Act cannot be invalidated simply because it makes access to the courts more expensive.

When access to the courts is regulated or limited in some manner, of course, at the same time that regulation or limitation *ipso facto* acts upon the right of trial by jury which accompanies resort to the courts,[23] and which is separately guaranteed by Article XV, section 6 of the Maryland Constitution, as well as by Article 5 of the Declaration of Rights. We must therefore also ascertain whether that right can be said to be violated by the precondition imposed here on access to the courts. As we observed earlier, the jury trial guarantee, in addition to requiring that there be no interference with the jury's determination of issues of fact, commands that the right "be not obstructed." *See In re Peterson*, 253 U. S. 300, 310, 40 S. Ct. 543, 64 L. Ed. 919 (1920). There is no obstruction, however, and appellees do not suggest otherwise, simply because the right is subjected to regulation. Thus, our predecessors in *Knee v. City Pass. Ry. Co.*, 87 Md. 623, 627, 40 A. 890, 892 (1898), observed:

> This common law practice [a stay of proceedings in a second action until the costs of a former action are paid], ante-dating our Constitution and Declaration of Rights, led naturally and almost inevitably . . . to the enactment of statutes . . . having for their object the just regulation of the right of trial by jury. . . . [I]t is gratifying to note with what sound and wise discrimination, in the main, the Courts have dealt with the subject, always

---

a variety of discovery devices and a pretrial hearing without running into constitutional trouble. If a legislature intends the screening panel procedure to function as an institutionalized attempt to encourage settlement, and the physical and financial burdens it imposes on potential plaintiffs [are]. kept to a minimum, the constitutional obstacles should not prove insurmountable. [Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications*, 55 Tex. L. Rev. 759, 796 (1977).]

23. Once access to the courts is gained, of course, a reading of the Act makes plain that the jury trial in those court proceedings is subjected to no additional or separate burden of any kind as a precondition to its exercise.

preserving unimpaired the ultimate historical right as it existed at the time of our separation from the mother country, while sustaining all reasonable regulations of the exercise of that right made in the interest of the general public.

We find that our analysis of the reasonableness of this Act's regulation of the jury trial right — by virtue of its regulation of access to the courts generally — begins and ends with a proposition long ago announced by our predecessors as "fully established": that "where a law secures the trial by jury upon an appeal, it is *no violation of a constitutional provision for guarding that right,* although such law may provide for a primary trial without the intervention of a jury." *Steuart v. Baltimore,* 7 Md. 500, 512 (1855) (emphasis added), *quoted in Bringe v. Collins,* 274 Md. 338, 347 n. 3, 335 A. 2d 670, 676 n. 3 (1975). In *Knee v. City Pass. Ry. Co., supra* at 625 [891], the Court stated that in the primary trial without jury approved in *Steuart,* "costs are incurred which must abide the final result on appeal, and which to that extent constitute an additional burden affixed to the right of trial by jury, *but that does not afford a test of the validity of the Act.*" (Emphasis added.) The *Knee* Court endorsed the view that the guarantee

is not violated "where the right of trial by jury is preserved before the final decision, in all cases where it would have existed at the time of the adoption of the Constitution, and where all contested issues of fact are determined by a jury and in no other way; and ... *any legislation therefore which merely points out the mode of arriving at this object, but does not rob the right of its essential ingredients,* cannot be considered an infringement of the right." [*Id.* at 633 [894] (citing *Smith v. Times Pub. Co.,* 178 Pa. 481, 36 A. 296 (1897)) (emphasis added).[24] ]

---

24. That a compulsory reference to an auditor prior to court consideration is not an infringement of the right to a jury trial where either party may demand a jury trial at the court hearing if he is dissatisfied with the report of the referee is recognized in Knee v. City Pass. Ry. Co., 87 Md. 623, 631-32, 40 A. 890, 894 (1898), and seems to be a generally accepted doctrine of law. *See* 50 C.J.S. *Juries* § 118, at 832-33 (1947). Also generally recognized is the

We think the analogy is compelling. It is perfectly plain that we could not, without repudiating *Steuart* and *Knee,* conclude that a system of compulsory arbitration, which permits trial by jury on rejection of the award, by itself in any way infringes the constitutional right to a jury trial. That is to say, *Steuart* and *Knee* compel the conclusion that the mere subjection to the arbitration procedure, analogous to a "primary trial without the intervention of a jury," is not *itself* an impermissible burden on the right.[25] We note particularly the language of the Supreme Court of Pennsylvania, upholding a statute permitting courts to adopt rules providing for compulsory arbitration, with de novo appeal, of civil suits involving $1,000 or less: [26]

> [The right to trial by jury is violated] only where the statute closes the courts to litigants and makes the decision of the arbitrators the final determination of the rights of the parties; therefore there is no denial of the right of trial by jury if the statute preserves that right to each of the parties by the allowance of an appeal from the decision of the arbitrators or other tribunal. In ... Capital Traction Co. [v. Hof, 174 U. S. 1, 23, 19 S. Ct. 580, 43 L. Ed. 873 (1899)]

principle that where the right of trial by jury in civil cases is secured by allowing an appeal to a court where such trial can be had, the exercise of the right by appealing cannot be unreasonably impaired, though conditions and regulations may be prescribed by the legislature. *See id.* § 119, at 833.

25. To conclude otherwise would require us to differentiate among causes of action and hold that, while the expense and delay necessitated by two trials is a permissible burden on the jury trial right in the case of small claims, it is impermissible in a malpractice case where the damages sought are often very great and where the cost of trying the case is higher than usual because of the frequent necessity for expert witnesses. This we will not do. We can discover no reasoned basis, and the appellees suggest none, for determining that a constitutional right to trial by jury without the intervention of any preliminary proceeding exists if the amount of money involved in the action is large enough — nor, if we could, do we perceive where the line might be drawn. Even malpractice causes of action themselves vary substantially in the amount of damages sought and the kind of proof necessary to be adduced. Furthermore, the ratio of cost to value of a small claim subjected to two proceedings may well be greater than that of a large malpractice claim. We are, in short, unpersuaded of the reasonableness of creating *ad hoc* exceptions to the principle stated in *Steuart. See* State ex rel. Strykowski v. Wilkie, 81 Wis. 2d 491, 261 N.W.2d 434, 449-50 (1978).

26. The statute has since been amended to include cases in which the amount in controversy is less than either $5,000 or $10,000, depending on the classification of the county. *See* Weber v. Lynch, 473 Pa. 599, 375 A. 2d 1278, 1279 n. 1 (1977).

it was said, . . . : "It [the Constitution] does not prescribe at what stage of an action a trial by jury must, if demanded, be had, or what conditions may be imposed upon the demand of such a trial, consistently with preserving the right to it." The only purpose of the constitutional provision is to secure the right of trial by jury before rights of person or property are *finally* determined. All that is required is that the right of appeal for the purpose of presenting the issue to a jury must not be burdened by the imposition of onerous conditions, restrictions or regulations which would make the right practically unavailable. [*Application of Smith,* 381 Pa. 223, 112 A. 2d 625, 629, *appeal dismissed sub nom. Smith v. Wissler,* 350 U. S. 858 (1955) (citations omitted).]

It only remains to ascertain whether the court proceeding, and hence the jury trial, following arbitration is subjected to any additional condition and, if so, whether that condition is so onerous as to make the right "practically unavailable." As a reading of the statute will make clear, the court proceeding with its jury trial is subjected to no regulation or burden of any kind as a precondition to its utilization. The statute does provide that the award of the arbitration panel must encompass an assessment of costs, including arbitrators' fees, § 3-2A05 (e); it also provides, however, that the award may be rejected and a court action filed. § 3-2A06 (a) & (b). The arbitral fees, we must assume, are then part of the final assessment of costs, and need not be paid as a precondition to the court proceeding and thus the jury trial.[27] *See* § 3-2A06 (e).

---

27. Even were we to assume, however, that payment of the arbitrators' fees — here amounting to $140 per day as set by the director pursuant to section 3-2A03 (d) of the Act — were a precondition to the court proceedings, it would not necessarily follow that an impermissible burden is thereby placed on the right to jury trial. It is settled law that the right may be subjected to reasonable regulation. Bettum v. Mont. Fed. S. & L. Ass'n, 262 Md. 360, 366, 277 A. 2d 600, 603 (1971); Houston v. Lloyd's, 241 Md. 10, 14, 20-22, 215 A. 2d 192, 194, 198-99 (1965). It has been recognized that it is not unreasonable to require the appellant to pay accrued costs and give recognizance for payment of costs which will accrue on appeal, *see* Application of Smith, 381 Pa. 223, 112 A. 2d 625, 630, *appeal dismissed sub*

The appellees seem to argue, however, that the knowledge that these fees will have to be paid at some future point if the suit is lost is itself an unreasonable obstruction of the right to trial by jury. This, of course, is the same argument which is rejected by the very principle that a preliminary proceeding is permissible. We risk redundance to refer again to the *Knee* Court's language: "In such primary trial, costs are incurred which must abide the final result on appeal, and which to that extent constitute an additional burden affixed to the right of trial by jury, but that does not afford a test of the validity of the Act." *Knee v. City Pass. Ry. Co., supra,* 87 Md. at 625, 40 A. at 891. The Court there quoted with approval *Beers v. Beers,* 4 Conn. 535, 539 (1823): "[T]he trial by jury . . . may be subjected to new modes, *and even rendered more expensive,* if the public interest demand such alteration." (Emphasis supplied in *Knee.*)

The appellees object as well to the delay entailed by requiring arbitration prior to trial, and in fact the trial court found that the time necessary to achieve a final judicial resolution of a claim if the arbitration panel's decision is rejected would be significantly lengthened. Delay, however, usually accompanies any two-step proceeding, and the same principles we have already set out support the conclusion that such delay does not unconstitutionally obstruct the court proceeding and the attendant right to trial by jury. *See In re*

*nom.* Smith v. Wissler, 350 U. S. 858 (1955), or to require appellant to furnish security for the prosecution of the appeal and satisfaction of the final judgment. Capital Traction Co. v. Hof, 174 U. S. 1, 23, 19 S. Ct. 580, 43 L. Ed. 873 (1899). The *Smith* court, indicating that the problem was one of degree rather than of kind, concluded that requiring payment of arbitrators' fees as a precondition to the right of appeal would be invalid if the fee were $75 and the case involved only $250, and directed the courts to provide for a lower rate of compensation where comparatively small claims were involved. Application of Smith, *supra* at 630. Similarly, the New Hampshire Supreme Court indicated that where prepayment of arbitration costs as a condition of appeal could entail payment of $750 or $1,125 to obtain a jury trial of a case involving $3,000 or less, the precondition would amount to an unconstitutional infringement of the right to trial by jury. Opinion of the Justices, 113 N. H. 205, 304 A. 2d 881, 887 (1973). The typical malpractice claim usually involves considerably greater sums, and always, if governed by the Act, more than $5,000. § 3-2A02 (a). For a recent malpractice case holding that the privileges and immunities clause of the Arizona Constitution was violated by the portion of a statute requiring the posting of a $2,000 cost and attorney fee bond as a precondition to court action following an award by a medical review panel, see Eastin v. Broomfield, 116 Ariz. 576, 570 P. 2d 744, 753-54 (1977).

*Peterson,* 253 U. S. 300, 310, 40 S. Ct. 543, 64 L. Ed. 919 (1920) (requirement of preliminary hearing by auditor in suit for money due does not infringe constitutional right because it involves delay in reaching jury trial).[28]

Finally, as to this aspect of the appellees' multifaceted attack on the Act, we may quickly dismiss the suggestion that the statute's requirement that attorneys' fees in connection with the arbitral and judicial proceedings be approved by the arbitration panel and the court respectively, *see* § 3-2A07, violates the due process clauses of the Maryland and federal constitutions. *See* Md. Decl. of Rts., Art. 23; U.S. Const. amend. XIV. Appellees argue in this regard that the right to contract is both a liberty and a property right and may not be interfered with by legislation which is arbitrary and capricious and bears no real and substantial relation to its object. The short answer to the Bar Association's objection is simply that there is no deprivation of property — no interference with the right to contract — evident from the terms of the Act.[29] Nothing therein suggests that an attorney may not enter into a fee arrangement with his client — it merely subjects the arrangement to approval as to reasonableness by the panel and the court. The right to contract, as the appellees concede, is always subject to reasonable regulation, *see Loughran Co. v. Candy & Tobacco Co.,* 178 Md. 38, 44, 12 A. 2d 201, 204 (1940), and that attorneys' fees are so subject is not open to doubt. *See Calhoun v. Massie,* 253 U. S. 170, 173-74, 40 S. Ct. 474, 64 L. Ed. 843 (1920); *cf. Mortgage Inv. v. Citizens Bank,* 278 Md. 505, 366 A. 2d 47 (1976). Attorneys' fees are statutorily

---

28. The Court in *Peterson,* 253 U. S. at 307, observed: "[S]uch a tentative trial acts as a sifting process by which misunderstandings and misconceptions as to facts are frequently removed. In the course of it many contentions or assumptions made by one party or the other are abandoned." It thus may well be that the delay involved in reaching jury trial will be offset somewhat by a shortening or streamlining of the trial itself.

29. Section 3-2A07 reads:

An attorney may not charge or collect compensation for legal services in connection with the arbitration of a claim under this subtitle unless it is approved by the arbitration panel. An attorney may not charge or collect compensation for legal services in connection with a judicial proceeding under this subtitle unless it is approved by the court.

regulated under the Workmen's Compensation Act, Md. Code (1957, 1964 Repl. Vol.), Art. 101, § 57, and under the Unemployment Insurance Law, Md. Code (1957, 1969 Repl. Vol.), Art. 95A, § 16 (b), and we have said as to the latter that lawyers who accept employment do so subject to the provisions of the act. *Davis v. Avnet,* 192 Md. 626, 630, 65 A. 2d 308, 310 (1949). Similarly, attorneys' fees are limited under the Federal Tort Claims Act to twenty-five percent of any judgment rendered, and an attorney charging an amount in excess of that allowed is subject to fine and imprisonment. 28 U.S.C. § 2678 (1970). The appellees offer no cogent argument why subjecting the fee to panel or court approval is facially unreasonable. *See Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657, 669-70 (1977) (approving statutory requirement that attorneys' fee arrangements in medical malpractice cases be subject to review by the court). The Bar Association's arguments in this regard are pure hyperbole.

Though we have thus concluded that the imposition of a nonbinding arbitration procedure as a precondition to resort to the courts is constitutionally permissible, we emphasize that this is so only so long as the legislature does not attach to that pretrial procedure conditions or restrictions, which do not exist here, so burdensome or oppressive as to make the right of access to the courts and the attendant right to jury trial "practically unavailable."

## III.

The appellees' only remaining shot in their salvo upon the statute — the assertion that it deprives them of the equal protection of the laws in violation of the fourteenth amendment and of the due process clause of Article 23 of our Declaration of Rights [30] — misses the mark as well. In this regard we briefly delineate certain of the facts found by the trial court pertinent to this issue: (1) The evidence adduced

---

[30]. We noted in Governor v. Exxon Corp., 279 Md. 410, 438 n. 8, 370 A. 2d 1102, 1118 n. 8 (1977), that the Maryland Constitution does not expressly provide for the equal protection of the laws as does the United States Constitution. As we did there, we here assume for purposes of this appeal that Article 23 of the Declaration of Rights embodies that concept and that the same standard of review applies. *See id.*

at trial "abundantly demonstrated" that a "severe" medical malpractice insurance crisis existed in Maryland in 1974 when the dominant insurer received a dramatic rate increase but shortly . thereafter decided to cease writing medical malpractice insurance in this State when it was refused an additional substantial increase; [31] (2) no new company entered the market in Maryland to fill the void created by the departure of the dominant insurer; (3) the instability of the insurance market continued even after the legislature's creation in 1975 of the Medical Mutual Liability Insurance Society of Maryland, see Md. Code (1957, 1972 Repl. Vol., 1977 Cum. Supp.), Art. 48A, §§ 548-556, an insurance company initially funded by a tax on Maryland physicians, which had alleviated the situation to some extent by making malpractice insurance available; (4) this statutorily-created company, insuring ninety percent of the physicians in Maryland, is an "admitted" carrier, whereas Mutual Fire, Marine & Inland Insurance Co., insuring that portion of the remaining ten percent not insured through policies carried by their employing hospitals, is a "surplus line" carrier, subject to virtually no regulation by the State, which could cancel policies without hearings before the Insurance Commissioner and whose rates were not subject to the Commissioner's approval; [32] (5) physicians could reasonably conclude that a "surplus line" carrier is a less desirable insurer than an "admitted" carrier; (6) the absence of any admitted carriers besides Medical Mutual in the State signifies the continued precariousness of the malpractice insurance market; (7) the report of the Medical Malpractice Insurance Study Committee, which recommended to the General Assembly adoption of legislation substantially identical to the Act now being challenged, was ambiguous as to the precise purpose arbitration would serve, but apparently the desired objectives

---

31. For a case chronicling the events supporting the trial judge's conclusion, see St. Paul Fire & Mar. v. Ins. Comm'r, 275 Md. 130, 133, 339 A. 2d 291, 293 (1975).

32. An admitted or authorized insurer "is one duly authorized, by subsisting certificate of authority issued by the [Insurance] Commissioner, to engage in the insurance business in this State." Md. Code (1957, 1972 Repl. Vol.), Art. 48A, § 7. For a description of a surplus line carrier and the extent to which it may operate in this State, see Md. Code (1957, 1972 Repl. Vol. & 1977 Cum. Supp.), Art. 48A, §§ 183-199.

there recorded encompassed essentially only the advantage of inducing the complainant to drop his claim in the event of an adverse arbitration award; and (8) the cost of insurance coverage would inevitably be passed on to the consumer of medical services. The trial court, noting that health care was a matter within the public interest and that its cost was subject to regulation under the police power of the legislature, concluded that the announced purpose of the Act — to reduce the cost of medical malpractice claims, thus reducing the cost of liability insurance and stabilizing the market — justified distinguishing the treatment of medical malpractice claims from other tort liability claims. The judge explained that since the evidence established that an arbitration procedure could reasonably be expected to result in the resolution of such claims more rapidly and less expensively than by the usual mode of litigation — the statute being designed to encourage arbitration as the final resolution of the claim — the Act bears a fair and substantial relation to its purpose and is thus not in contravention of the fourteenth amendment or our Declaration of Rights.

The appellees claim, nevertheless, that there was no medical malpractice crisis or medical malpractice insurance crisis other than that created by the doctors themselves, that is, that appellant Medical and Chirurgical Faculty of Maryland, a voluntary professional organization whose membership encompasses ninety-five percent of Maryland's physicians, frustrated new insurance carriers from coming into the market by refusing to endorse them unless they would agree to pay the agent's commission to the Faculty's own insurance agency; they also claim that the 1975 legislation creating Medical Mutual eliminated any need for additional legislation. However, even if it were established that members of the medical profession somehow precipitated the crisis, the fact would not be altered that difficulties existed in the insurance market and that the legislature could attempt to meet that situation by whatever rational method it deemed most appropriate. Nor is there any basis for the suggestion that the legislature could not properly view its creation of Medical Mutual as merely a temporary solution

to the problem. One would, in fact, have to be an ostrich to suggest that no medical malpractice insurance problems existed which the legislature could appropriately attempt to resolve. For a delineation of the nature of the crisis nationwide as well as types of legislative action proposed and taken to deal with it, see Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex. L. Rev. 759 (1977); Comment, *An Analysis of State Legislative Responses to the Medical Malpractice Crisis,* 1975 Duke L.J. 1417; Comment, *Recent Medical Malpractice Legislation — A First Checkup,* 50 Tulane L. Rev. 655 (1976). We think it clear that this statute, requiring the submission of a malpractice claim to arbitration prior to court suit and thus treating medical malpractice tort claimants differently from other tort claimants, works no violation of the equal protection of the laws.

Initially, we may quickly dispose of the Bar Association's assertion that, since the statute affects the exercise of the right to trial by jury in a civil action, Md. Const., Art. XV, § 6, its differential treatment of malpractice claimants should be subjected to the strict scrutiny which is employed when a classification limits a fundamental right or operates to the disadvantage of a suspect class and hence must be justified by a compelling state interest.[33] The appellee's assertion is premised on the mistaken assumption that the Act interferes with the right to a jury trial. Thus, although we have indeed held that in Maryland the right to a fair and impartial jury in a civil action is a fundamental one, *see Davidson v. Miller,* 276 Md. 54, 68-69, 344 A. 2d 422, 431-32 (1975), in accordance with the principle that a fundamental right is one explicitly or implicitly guaranteed by the Constitution, *see San Antonio School District v. Rodriguez,* 411 U. S. 1, 33-34, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973),[34] we have already established that the statutory classification here in no way deprives, infringes, or

---

33. For citation of cases in which this standard has been appropriately applied, see Wheeler v. State, 281 Md. 593, 601-02, 380 A. 2d 1052, 1057 (1977).

34. The right to civil trial by jury in state courts is not explicitly guaranteed by the United States Constitution, nor has the seventh amendment right thus far been required of the states as a matter of federal due process through the fourteenth amendment. *See* Bringe v. Collins, 274 Md. 338, 341-45, 335 A. 2d 670, 673-75 (1975).

interferes with the free exercise of the right to a civil jury trial. For cases indicating that a statutory classification is to be strictly scrutinized when it deprives, infringes, interferes with, or penalizes the free exercise of a constitutional right, see *Memorial Hospital v. Maricopa County,* 415 U. S. 250, 258, 94 S. Ct. 1076, 39 L.Ed.2d 306 (1974) (interstate travel); *San Antonio School District v. Rodriguez, supra,* 411 U. S. at 38 (education); *Oregon v. Mitchell,* 400 U. S. 112, 238, 91 S. Ct. 260, 27 L.Ed.2d 272 (1970) (interstate travel) (separate opinion of Brennan, White& Marshall, JJ.).

As the Supreme Court recently observed in this context in *Zablocki v. Redhail,* 434 U. S. 374, 388, 98 S. Ct. 673, 682, 54 L.Ed.2d 618 (1978), it is only when a statutory classification significantly interferes with the exercise of a fundamental right that it is subjected to rigorous scrutiny. The Court in *Zablocki,* reaffirming the fundamental character of the right to marry, cautioned:

> [W]e do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed. [*Id.* at 386, 98 S. Ct. at 681.]

Since there is here no interference with the exercise of a fundamental right, and since there is no contention, nor could there be, that a suspect classification is involved, there is no occasion to subject the Act to strict scrutiny.

Failing in their argument that the statutory classification should be strictly scrutinized, the appellees alternatively suggest that an intermediate or means-focused standard of scrutiny should be applied to this legislation; however, our assessment of the validity of the Act will remain the same whether that standard or the traditional rational basis test is applied. Much has been written about the differences between traditional equal protection analysis, which employs the rational basis test for all legislative classifications not strictly scrutinized, and what has been asserted to be a

"means-focused" test which would require that legislative means substantially further legislative ends. Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 20 (1972). This Court appears not to have differentiated between these two standards to any significant degree, observing that the reasonable basis test requires that a statutory classification bear some rational relationship to a legitimate state purpose *or* rest upon some ground of difference having a fair and substantial relation to the object of the legislation. *See, e.g., Wheeler v. State,* 281 Md. 593, 602-03, 380 A. 2d 1052, 1058 (1977), and *Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 507, 312 A. 2d 216, 222 (1973), including cases cited in each. Thus we have flatly stated that "[c]ompliance with the Equal Protection Clause requires that legislative classification rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Wheeler v. State, supra* at 603 [1058] (quoting *Prince George's Co. v. McBride,* 268 Md. 522, 531, 302 A. 2d 620, 624-25 (1973) (citing cases)). Indeed, Professor Gunther observes that his "means-focused" test "would have the Court take seriously a constitutional requirement that has never been formally abandoned: that legislative means must substantially further legislative ends." Gunther, *supra* at 20.[35]

---

35. Another commentator differentiates between the two tests by suggesting that under the rational basis test, a court will generally defer to a legislative determination that the means chosen will in fact accomplish its purpose, whereas a court using the means-focused standard will appraise more carefully the factual assumptions underlying the asserted connection between means and ends; he notes that the difference Professor Gunther emphasizes is that while a court using the rational basis test will hypothesize conceivable purposes for the classification, it will not do so when using the means-focused test. Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex. L. Rev. 759, 772 & n. 88 (1977). Without concluding that it would be improper to do so, we have here no need to hypothesize a conceivable purpose for the statute — it takes no imagination to perceive that its purpose is clearly to control the precarious situation obtaining in the medical malpractice insurance market and its effects on the cost of health care. And, even if we carefully appraise the existence of a connection between the legislation and accomplishment of the goal of reduced malpractice insurance rates, as Professor Redish suggests is required when the "means-focused" test is used, *see* Redish, *supra* at 780, it is not necessary to conclude, as he does, that it is therefore inadvisable to use that test due to the impossibility of predicting whether such reform legislation will accomplish its goal. *Id.* at 782. This is so because of the

Applying the traditional rational basis test — the standard employed by a number of our sister states in rejecting challenges to similar legislation, *see Eastin v. Broomfield,* 116 Ariz. 576, 570 P. 2d 744, 750-51 (1977); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657, 667-68 (1977); *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 261 N.W.2d 434, 441-43 (1978) — it is apparent that the distinction between malpractice claimants and other tort claimants is reasonably related to the legitimate purpose of the Act, namely the protection of the public health and welfare by assuring the availability of malpractice insurance at reasonable rates.[36] Moreover, even if the reasonable relationship here were not so obvious, "[a] statutory discrimination will not be set aside as [a] denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." *Davidson v. Miller,* 276 Md. 54, 70, 344 A. 2d 422, 432 (1975); *see Governor v. Exxon Corp.,* 279 Md. 410, 439, 370 A. 2d 1102, 1118 (1977).

Should we, in any event, apply the means-focused standard as creating a more onerous burden than the traditional rational basis test, we would reach no different result. We have no difficulty in concluding that the legislative requirement that malpractice claimants, unlike other tort claimants, first present their contentions to an arbitration panel rests upon a ground of difference bearing a "fair and

principle that the legislature may not be precluded from attempting to resolve a problem by means whose results cannot be definitively demonstrated in advance. *See* text at page 313 *infra.*

36. In this connection the Supreme Court of Nebraska in *Prendergast* observed:

"There are substantial reasons for legislative discrimination in regard to this field. We have seen in recent years the growth of malpractice litigation to the point where numerous insurance companies have withdrawn from this field. Insurance rates are practically prohibitive so that many professional people must either remain unprotected or pass the insurance charges along to their patients and clientele in the form of exorbitant fees and charges. This unduly burdens the public which requires professional services." [256 N.W.2d at 668 (quoting Taylor v. Karrer, 196 Neb. 581, 244 N.W.2d 201, 204 (1976)).]

*But see* Jones v. State Board of Medicine, 97 Idaho 859, 555 P. 2d 399, 410-16 (1976) (applying the "fair and substantial relationship" test to an equal protection challenge to a statute limiting medical malpractice recoveries and remanding for further factual information), *cert. denied,* 431 U. S. 914, 97 S. Ct. 2173 (1977).

substantial relation" to the object of the legislation, which seeks to encourage the resolution of such claims without judicial proceedings, thus reducing their cost and consequently the cost of insurance. Obviously there can be no guarantee that the legislation will have the desired effect, thus substantially furthering legislative ends, but we think in a case such as this none is required. This is so because we are of the view that a principle we have applied in rejecting due process challenges to legislation claimed to be arbitrary is applicable here as well: that it is inappropriate for a court to preclude the legislature from attempting to resolve a problem in a particular manner simply because the intended results cannot be definitively demonstrated in advance. "Courts are under a special duty to respect the legislative judgment where the legislature is attempting to solve a serious problem in a manner which has not had an opportunity to prove its worth." *Bowie Inn v. City of Bowie,* 274 Md. 230, 237, 335 A. 2d 679, 684 (1975). The "fair and substantial relation" test is met, in a situation where the problem sought to be resolved is unique and the possible techniques for its solution are therefore untested, where the available evidence suggests the soundness of the theory.[37] The burden is upon those who attack the legislation in such a case to show that it will not likely accomplish its goal, *see, e.g., Wheeler v. State, supra,* 281 Md. at 603, 380 A. 2d at 1058, and that burden here has not been discharged.

## IV.

In concluding this somewhat lengthy opinion, caused in no small degree by the many maladies with which it is claimed this infant statute is afflicted and which have required a complete examination, we reiterate that the statute is free

---

37. Otherwise analyzed, this may be a situation in which exercise of "means-focused" scrutiny of equal protection questions is limited, as Professor Gunther suggests, by "particularized considerations of judicial competence." Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 23 (1972). He specifically suggests that a court cannot "confidently assess whether the means contribute to the end" when the data are exceedingly complex and technical, or when the legislature could reasonably respond to a problem with any one of a wide range of allocation decisions. *Id.* at 24. The same may be true where the problem is new and its solutions untested.

from infirmity on the grounds urged by the appellees, and we therefore reverse the judgment of the Baltimore City Court and direct the issuance of a declaration that the Act is constitutional.

> *Judgment reversed and case remanded to the Baltimore City Court with directions to enter a judgment declaring that Chapter 235 of the Laws of 1976, codified as Md. Code (1974, 1977 Cum. Supp.), §§ 3-2A01 to 3-2A09 of the Courts Article, is constitutional. Costs to be paid by the appellees.*